IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Ray Furchak; | § | CIVIL NO. |
| | § | |
| STATE OF CALIFORNIA, *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF COLORADO *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF CONNECTICUT *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF DELAWARE, *ex rel.* | § | |
| Ray Furchak; | § | RELATOR RAY FURCHAK'S |
| DISTRICT OF COLUMBIA *ex rel.* | § | ORIGINAL COMPLAINT FILED |
| Ray Furchak; | § | PURSUANT TO 31 U.S.C. |
| STATE OF FLORIDA *ex rel.* | § | §§ 3729 – 3732 FEDERAL |
| Ray Furchak; | § | FALSE CLAIMS ACT AND STATES' |
| STATE OF GEORGIA *ex rel.* | § | FALSE CLAIMS ACT AND |
| Ray Furchak; | § | PENDENT CLAIMS |
| STATE OF HAWAII *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF ILLINOIS *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF INDIANA *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF IOWA *ex rel.* | § | |
| Ray Furchak; | § | FILED UNDER SEAL |
| STATE OF LOUISIANA *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF MARYLAND *ex rel.* | § | |
| Ray Furchak; | § | |
| COMMONWEALTH OF MASSACHUSETTS | § | |
| *ex rel.* Ray Furchak; | § | |
| STATE OF MICHIGAN *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF MINNESOTA *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF MONTANA *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF NEVADA *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF NEW HAMPSHIRE *ex rel.* | § | |
| Ray Furchak; | § | |

| | | |
|---|---|---|
| STATE OF NEW JERSEY *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF NEW MEXICO *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF NEW YORK *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF NORTH CAROLINA *ex rel.* | § | RELATOR RAY FURCHAK'S |
| Ray Furchak; | § | ORIGINAL COMPLAINT FILED |
| STATE OF OKLAHOMA *ex rel.* | § | PURSUANT TO 31 U.S.C. |
| Ray Furchak; | § | §§ 3729 – 3732 FEDERAL |
| STATE OF RHODE ISLAND *ex rel.* | § | FALSE CLAIMS ACT AND STATES' |
| Ray Furchak; | § | FALSE CLAIMS ACT AND |
| STATE OF TENNESSEE *ex rel.* | § | PENDENT CLAIMS |
| Ray Furchak; | § | |
| STATE OF TEXAS *ex rel.* | § | |
| Ray Furchak; | § | |
| COMMONWEALTH OF VIRGINIA *ex rel.* | § | |
| Ray Furchak; | § | |
| STATE OF WASHINGTON *ex rel.* | § | |
| Ray Furchak; | § | JURY TRIAL DEMANDED |
| STATE OF WISCONSIN *ex rel.* | § | |
| Ray Furchak, and | § | |
| Doe States 1 – 21 *ex rel.* | § | |
| Ray Furchak, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| INSYS THERAPEUTICS, INC.; INSYS | § | |
| PHARMA, INC.; EJ FINANCIAL | § | |
| ENTERPRISES, INC.; NEOPHARM, INC.; | § | |
| ONCOMED, INC.; ITNI MERGER SUB, | § | |
| INC.; and DR. JOHN KAPOOR | § | |
| | § | |
| Defendants. | § | |
| | § | |

## RELATOR RAY FURCHAK'S ORIGINAL COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   PARTIES ................................................................................................. 2

III.  RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY............................. 5

IV.  JURISDICTION AND VENUE ................................................................... 6

V.   STATUTORY AND REGULATORY BACKGROUND ..................................... 7

     A.     The FDA's Role in the Regulation of Prescription Drugs........................ 7

          i.      FDA Approval of Prescription Drugs .......................................... 7

          ii.     FDA Regulation of Manufacturers' Marketing of Prescription Drugs ....... 8

     B.     Reimbursement of Prescription Drugs Under Medicaid, Medicare Part D, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefits Plan, and Other Federal Healthcare Programs ........................................................ 10

          i.      Medicaid ............................................................................. 10
                 a.     Medicaid Provider Certifications ..................................... 11

          ii.     Medicare Part D .................................................................... 24
                 a.     Medicare Certification .................................................... 27

          iii.    CHAMPUS/TRICARE, CHAMPVA, and Federal Employee Health Benefits Plan .......................................................... 28

     C.     Prohibition of Kickbacks Associated with Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, and Federal Employee Health Benefits Plan Prescriptions .................................................................... 28

          i.      Federal Anti-Kickback Statute................................................. 29

          ii.     OIG, PhRMA, AMA and ACCME's Guidelines on the Manufacturer-Doctor Relationship and Behaviors that Violate the Anti-Kickback Statute ............................................................ 30

VI.  FACTUAL ALLEGATIONS AND INSYS THERAPEUTICS, INC.'S SCHEME TO SELL SUBSYS THROUGH OFF-LABEL MARKETING AND ILLEGAL KICKBACKS.......................... 31

i

A. Breakthrough Cancer Pain Management and Subsys Overview .......................... 31

B. Relator Furchak's Discovery of Insys's Kickback Scheme and
Off-Labeling Marketing Strategies ........................................................ 34

    i. Relator Furchak's Discovery of Insys's Nationwide Kickback Scheme ... 34

    ii. Relator's Discovery of the Nationwide Off-Label Marketing Scheme .... 39

        a. Subsys's Targeted Population ........................................ 40

        b. Subsys "Effective Dose" Message ................................. 42

VII. ACTIONABLE CONDUCT ................................................................. 44

A. Applicable Law ........................................................................ 44

    i. The False Claims Act ........................................................ 44

B. Insys's Violations of the FCA .......................................................... 47

    i. Defendants' Off-Label Marketing and Kickback Schemes Violate
the FCA, 31 U.S.C. § 3729(a)(1)(A) ........................................ 47

    ii. Defendants' Off-Label Marketing and Kickback Schemes and
Their Causation of Fraudulent Certifications to be Made to
Medicare, Medicaid and other Federal Health Care Programs Violate
the FCA, 31 U.S.C. § 3729(a)(1)(B) ........................................ 50

VIII CAUSES OF ACTION ................................................................... 52

    A. COUNT I. – FALSE CLAIMS ACT – 31 U.S.C. § 3729 (a)(1)(A) ............................ 52

    B. COUNT II. – FALSE RECORDS OR STATEMENTS – 31 U.S.C. § 3729(a)(1)(B) ...... 53

    C. COUNT III. – CALIFORNIA FALSE CLAIMS ACT ................................... 55

    D. COUNT IV. – Colorado False Claims Act ........................................ 58

    E. COUNT V. – Connecticut Act Implementing the Provisions of the
Budget Concerning Human Services and Making Changes to
Various Social Services Statutes ........................................................ 61

    F. COUNT VI. – Delaware False Claims and Reporting ACT ................................ 64

    G. COUNT VII. – District of Columbia Procurement Reform Amendment Act ...... 67

ii

H.   Count VIII. – Florida False Claims Act ...........................................................70

I.   Count IX. – Georgia False Medicaid Claims Act ..............................................73

J.   Count X. –  Hawaii False Claims Act .................................................................76

K.   COUNT XI. – Illinois Whistleblower Reward and Protection Act.......................79

L.   COUNT XII. – Indiana False Claims and Whistleblower Protection Act ............83

M.   COUNT XIII. – Iowa False Act ...........................................................................86

N.   Count   XIV.   –   Louisiana   Medical   Assistance   Programs
     Assistance Programs Integrity Law  ...................................................................88

O.   Count XV. - Maryland False Claims Act.............................................................92

P.   COUNT XVI. – Massachusetts False Claims Act..................................................94

Q.   COUNT XVII. – Michigan Medicaid False Claims Act ........................................98

R.   Count XVIII.– Minnesota False Claims Act .....................................................101

S.   Count XIX.– Montana False Claims Act............................................................104

T.   Count XX. – Nevada False Claims Act .............................................................107

U.   Count XXI. – New Hampshire Medicaid Fraud and False Claims
     Act .....................................................................................................................110

V.   Count XXII. – New Jersey False Claims Act ....................................................113

W.   Count XXIII. – New Mexico Medicaid False Claims Act ................................115

X.   Count XXIV. – New York False Claims Act  ....................................................119

Y.   Count XXV. – North Carolina False Claims Act ..............................................122

Z.   Count XXVI. – Oklahoma Medicaid False Claims Act  ...................................125

AA.   Count XXVII. – Rhode Island State False Claims Act ...................................128

BB.   COUNT XXVIII. –  Tennessee Medicaid False Claims Act............................131

CC.   Count XXIX. – Texas False Claims Act .......................................................134

DD.   C<small>OUNT</small> XXX. – Virginia Fraud Against Taxpayer Act ....................................137

EE.   Count XXXI. - Washington False Claims Act ................................140

FF.   C<small>OUNT</small> XXXII. – Wisconsin False Claims Act  ..............................143

GG.  C<small>OUNT</small> XXXIII. – Common Fund Relief ......................................146

IX.   J<small>URY</small> D<small>EMAND</small> .............................................................................................147

1.     Plaintiff/Relator Ray Furchak submits this Original Complaint under 31 U.S.C. §§ 3729-3732 ("False Claims Act") on behalf of the United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Washington, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia ("Qui Tam States"), Doe States 1 – 21 and on his own behalf, to recover all damages, penalties, and other remedies established by the False Claims Act and other false claims statutes on behalf of the United States, the Qui Tam States, the Doe States, and himself, and would show the following:

## I.     INTRODUCTION

2.     In January of 2012, the FDA approved Insys Therapeutics, Inc.'s fentanyl drug, Subsys, for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and tolerant to opioid therapy for their underlying persistent cancer pain.  Insys wasted no time in illegally marketing the drug nationwide.  First, Insys doled out kickbacks to doctors in exchange for prescriptions of Subsys, all in an effort to drive sales. Perhaps realizing that kickbacks alone would not be enough to push sales of Subsys, Insys devised marketing campaigns aimed at promoting off-label uses for the drug.  The approved labeling for Subsys states that a doctor should begin the patient on an initial dose of 100 mcg of Subsys and titrate the patient to a tolerable dose.  Insys began claiming that doctors should start patients on a higher initial dose of 400 mcg of Subsys.  Moreover, Insys subtly suggested to physicians that they could use Subsys for all the same uses for which the physicians might prescribe its competitor products, Actiq and Fentora, drugs promoted by Cephalon.  In 2008,

Cephalon agreed to pay $425 million to settle allegations that Cephalon promoted Actiq for all types of pain, under the mantra "pain is pain," even though Actiq was only approved for breakthrough cancer pain. Insys has played upon Cephalon's "pain is pain" message and off-label promotions by suggesting to doctors that Subsys could be used the same way that a doctor uses Actiq or Fentora, in hopes of capturing a broader patient base for Subsys. Insys trained its sales force to make all of these assertions, and they continue to market Subsys accordingly today.

3.      Insys's off-label marketing and kickback schemes constitute a massive fraud upon Medicaid, Medicare, Tricare, and other government health programs, which in the last six months have paid significant funds for Subsys for their enrollees. Its false and misleading claims about Subsys have already led to misconceptions by patients and physicians about the inappropriate dosing of Subsys and the inappropriate usage of Subsys in non-cancer patients, misconceptions likely to increase commensurately with Subsys's swiftly-growing sales. As a result of this nationwide scheme, Insys has violated and continues to violate the False Claims Act and reap profits far beyond those it could achieve from legitimate promotion.

## II.      PARTIES

4.      Plaintiff/ Relator Ray Furchak is a citizen of the United States and a resident of the state of Texas. Relator Furchak, a licensed veterinarian technician, began his sales career in 2006 in New York, selling veterinary devices for Butler Animal Health. In January 2008, he changed jobs and began working for DSI, selling preclinical medical devices that were implanted in research animals. In February 2012, approximately one month before Subsys's launch, Relator Furchak was hired by Insys in the capacity of Specialty Sales Professional. As

an Insys sales representative, he has marketed Subsys in the Houston region based on national directives and guidelines.

5.     The United States Government and the named qui tam states are the government plaintiffs in this case.

6.     Plaintiff Doe States 1-21 include the states that subsequent to the filing of this Complaint enact *qui tam* statutes and the right to initiate *qui tam* lawsuits, or whose previously enacted statutes become effective after the filing of this case.  The Doe States 1-21 include the States of Alabama, Alaska, Arizona, Arkansas, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, Vermont, West Virginia, and Wyoming.

7.     Defendant Insys Therapeutics, Inc. ("Insys") and the other Insys Defendants named in this lawsuit trace their origins to John Kapoor, founder of EJ Financial Enterprises, Inc., a healthcare consulting and investment company, and co-founder of Insys.  Dr. Kapoor founded EJ Financial Enterprises in 1990, and has served as the President of the business ever since.  He co-founded Insys in 1990 and has been its Executive Chairman since June 2006.  He has been a director of Insys Pharma, a subsidiary of Insys Therapeutics, from its inception in 2002.  Dr. Kapoor has held executive management and board positions at several pharmaceutical companies, including UNIMED Pharmaceuticals, Akron, Inc., Sciele Pharma, and Option Care, Inc., from the early 1990s until 2002.

8.     Insys began its corporate life as Oncomed Inc., incorporated in Delaware in June 1990, and subsequently changed its name to NeoPharm, Inc.  On October 29, 2010, NeoPharm, Inc. merged with Insys Therapeutics, a Delaware corporation, and ITNI Merger Sub Inc., its wholly-owned subsidiary and a Delaware corporation.  Pursuant to the merger agreement, ITNI

Merger Sub Inc. and Insys Therapeutics merged into one corporation called Insys Pharma, Inc., and NeoPharm changed its name to Insys Therapeutics. Insys Pharma is a subsidiary of Insys.

9. Although Insys has been around the pharmaceutical arena since 1990, Subsys is the first brand name drug that Insys has created and marketed. On March 26, 2012, Insys launched Subsys, designed to compete against the fentanyl drugs that include Cephalon's drugs, Actiq and Fentora. Insys continues to research products, including a medical marijuana product, a generic version of Dronabinol, and breast cancer drug, in hopes of launching products in the near future.

10. Insys Therapeutics, Inc. is incorporated in the state of Delaware with its corporate offices in Phoenix, Arizona. It may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware, 19801.

11. Insys Pharma Inc. is a subsidiary of Insys Therapuetics, Inc. and is headquartered in Phoenix, Arizona. It may be served through its registered agent Michael Babich, 10220 S. 51st Street, Ste. 2, Phoenix, Arizona, 85044.

12. EJ Financial Enterprise, Inc. is headquartered in Lake Forest, Illinois. It may be served through its registered agent C T Corporation System, 208 South LaSalle Street, Ste. 814, Chicago, Illinois, 60604-1101.

13. Neopharm, Inc., now named Insys Therapeutics, Inc., is headquartered in Phoenix, Arizona. It may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware, 19801.

14. Oncomed, Inc., now known as Insys Therapeutics, Inc., is headquartered in Phoenix, Arizona. It may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware, 19801.

15.    ITNI Merger Sub Inc., now known as Insys Pharma, Inc., is headquartered in Phoenix, Arizona.  It may be served through its registered agent Michael Babich, 10220 S. 51st Street, Ste. 2, Phoenix, Arizona, 85044.

16.    John N. Kapoor may be served at 1925 West Field Court, Ste. 300, Lake Forest, Illinois, 60045 at EJ Financial Enterprises, Inc.'s headquarters.

17.    Insys Therapeutics, Inc., Insys Pharma, Inc., EJ Financial Enterprises, Inc., Neopharm, Inc., Oncomed, Inc., ITNI Merger Sub, Inc., and Dr. John Kapoor will collectively be referred to hereinafter as "Insys" or "Defendants."

### III.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

18.    Any and all acts alleged herein to have been committed by Defendant Insys Therapeutics, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of Insys Therapeutics, Inc. and within the course and scope of their employment.

19.    Any and all acts alleged herein to have been committed by Defendant Insys Pharma, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of Insys Pharma, Inc. and within the course and scope of their employment.

20.    Any and all acts alleged herein to have been committed by Defendant EJ Financial Enterprises, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of EJ Financial Enterprises, Inc. and within the course and scope of their employment.

21.    Any and all acts alleged herein to have been committed by Defendant Neopharm, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of Neopharm, Inc. and within the course and scope of their employment.

22.    Any and all acts alleged herein to have been committed by Defendant Oncomed, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of Oncomed, Inc. and within the course and scope of their employment.

23.    Any and all acts alleged herein to have been committed by Defendant ITNI Merger Sub, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of ITNI Merger Sub, Inc. and within the course and scope of their employment.

24.    Insys Therapeutics, Inc., Insys Pharma, Inc., EJ Financial Enterprises, Inc., Neopharm, Inc., Oncomed, Inc., ITNI Merger Sub, Inc., and Dr. John Kapoor are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior.  Dr. Kapoor essentially owns of all the defendant companies.   Insys Pharma, Inc. is a wholly owned subsidiary of Insys Therapuetics, Inc. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## IV.    JURISDICTION AND VENUE

25.    Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by the Defendants, some of

which occurred in the Southern District of Texas and because the Defendants transact other business within the Southern District of Texas.

26. All the named Defendants engage in business in the State of Texas and within the Southern District Texas, all of which it accomplishes through its corporate center, business units, subsidiaries, officers, directors, employees, and agents. All of the named Defendants are subject to the general and specific personal jurisdiction this Court pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. §3729.

**V.  STATUTORY AND REGULATORY BACKGROUND**

**A.  The FDA's Role in the Regulation of Prescription Drugs**

**i.  FDA Approval of Prescription Drugs**

27. The Food and Drug Administration ("FDA") regulates human use of pharmaceutical drugs such as Subsys. Companies seeking to introduce new drugs for human use into interstate commerce must comply with FDA statutes and regulations, such as the Federal Food, Drug, and Cosmetic Act ("FDCA"). 21 U.S.C. § 301 *et seq*. Notably, the FDCA prohibits companies from distributing in interstate commerce any drugs that the FDA has not approved as safe and effective. 21 U.S.C. § 355(a), and (b).

28. In order for a company to gain approval of a drug by the FDA, the company must first submit and receive approval of a New Drug Application ("NDA") pursuant to 21 U.S.C. § 355. The company is required to include in its NDA all intended uses proposed for a new drug's labeling and to prove that the new drug is safe and effective for those uses. 21 U.S.C. § 355(b). To prove that the drug is safe and effective, the company must provide the FDA with data from scientifically sound clinical trials. The FDA will refuse approval of a new drug

unless, on the basis of all information reviewed, it is demonstrated that a drug can safely accomplish its purported effect under the conditions proposed, and that the method of manufacture and distribution will properly preserve the drug for this purpose. 21 U.S.C. § 355(d).

### ii.    FDA Regulation of Manufacturers' Marketing of Prescription Drugs

29.    When the FDA reviews an NDA and approves a drug for interstate distribution, that approval is only effective for the intended uses that were proposed in the NDA and described on the drug's approved label. Any use for a drug that was not proposed in the NDA and approved for the label by the FDA is referred to as "unapproved" or "off-label." 65 Fed. Reg. 14286, 14286 (Mar. 16, 2000). Although physicians traditionally may prescribe a drug for an off-label use so long as the drug has been FDA-approved for some use, pharmaceutical companies are strictly prohibited from marketing a drug for an off-label use.

30.    When a company markets a drug off-label, the drug becomes a new drug for that purpose and is considered "misbranded" in violation of 21 U.S.C. § 331, 21 U.S.C. § 352(f), 21 C.F.R. § 310.3 (h)(4) and (5), 65 Fed. Reg. 14286, 14286 (Mar. 16, 2000) ("[A]n approved new drug that is marketed for a 'new use' is also 'misbranded' under the FDCA, because the labeling of such a drug would not include 'adequate directions for use.'"). Section 352 of title 21 of the United States Code lists situations in which a drug is illegally misbranded, including but not limited to situations where: (1) the drug's labeling is "false or misleading in any particular;" (2) the drug's labeling does not bear adequate direction for use; or (3) the drug's labeling does not bear "adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users . . . ." *See* 21 U.S.C. § 352(a) and (f).

8

31.  The term "labeling" encompasses the actual label attached to the drug's immediate container, as well as all "other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."  21 C.F.R. § 321(m).  The term has been construed to include a variety of drug company promotional materials, including booklets, pamphlets, and literature that is textually related to the product, even when disseminated without the presence of the drug.  *See Kordel v. United States*, 335 U.S. 345, 349 (1948); *V.E. Irons, Inc. v. United States*, 244 F.2d 34, 39 (1st Cir. 1957).  In determining if a drug's labeling or advertising is misleading and thus misbranded, one must examine "(among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article" as described by the labeling or advertising or the customary or usual use of the article.  21 U.S.C. § 321(n).

32.  In order for a drug's labeling to include "adequate directions for use," the directions must allow a layman to use the drug safely and for its "intended use."  *See* 21 C.F.R. § 201.5.  The "intended use" of a drug refers to "the objective intent of the person legally responsible for the labeling of drugs."  *See* 21 C.F.R. § 201.128.  "The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article," and "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives."  *Id*.  Thus, if a manufacturer promotes a drug for a use for which the label does not provide adequate directions for use or is otherwise false and misleading, misbranding has occurred, regardless of Medicaid's or Medicare's reimbursement of the drug for this use.

33.   Over the years, the FDA has issued regulatory guidances to aid manufacturers in distinguishing between these illegal marketing strategies and legitimate non-promotional dissemination of information on off-label uses, by setting forth factors to determine whether a manufacturer's dissemination of information is actually promotional.  These guidances make it clear that pharmaceutical manufacturers cannot use reprints, reference texts or Continuing Medical Education ("CME") programs as tools to promote off-label uses.  *See* Guidance to Industry on Dissemination of Reprints of Certain Published, Original Data, 61 Fed. Reg. 52800 (Oct. 8, 1996); Guidance for Industry Funded Dissemination of Reference Texts, 61 Fed. Reg. 52800 (Oct. 8, 1996); Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64074 (Dec. 3, 1997); Guidance for the Industry: Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices, 74 Fed. Reg. 1694-01 (Jan. 13, 2009).  None of these guidances have changed the FDA's long-standing prohibition against marketing and promoting approved drugs for off-label uses.

**B.   Reimbursement of Prescription Drugs under Medicaid, Medicare Part D, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefits Plan, and Other Federal Healthcare Programs**

**i.   Medicaid**

34.   As a general rule, to be reimbursable under a state's Medicaid program, a drug must be included on the state's formulary.  Each state has its own means of deciding coverage, but federal law sets forth requirements states must meet in excluding or restricting coverage. *See* 42 U.S.C. § 1396r-8.  A state may exclude or restrict coverage of a drug in four instances:

(1)     the prescribed use is not for a medically accepted indication;
(2)     the drug is on a list of drugs excluded by the state from Medicaid coverage;

10

>    (3)    the drug manufacturer agreed to the restrictions on the drug in its rebate
>           agreement with Medicaid; or
>    (4)    the drug was excluded from the state's drug formulary.

31 U.S.C. § 1396r-8(d)(1).  In addition, states may use prior authorization programs or preferred

drug lists to control potential abuses of drugs, such as prescriptions for an indication that is not a

medically accepted indication.

35.    A "medically accepted indication" is a use that is listed in the labeling approved

by the FDA or "the use of which is supported by one or more citations included or approved

for inclusion in" one of the drug compendia identified by the Medicaid statute.  42 U.S.C. §

1396r-8(k)(6).    These compendia are the American Hospital Formulary Service Drug

Information, the United States Pharmacopeia-Drug Information (or its successor publications),

and the DRUGDEX Information System.  42 U.S.C. § 1396r-8(g)(1)(B)(i).  The United States

Government and the states interpret "supported by" to require "some form of corroboration or

validation."    United States' Statement of Interest in Response to Defendant's Motion to

Dismiss Plaintiff's First Amended Complaint,  *United States ex rel. Rost v. Pfizer, Inc*., 03-CV-

11084, at p. 5 (May 16, 2008); *see also* Centers for Medicare and Medicaid Release No. 141

(May 4, 2006) ("The statute requires coverage of off-label uses of FDA-approved drugs for

indications that are supported (as opposed to listed) in the compendia specified in section

1927(g)(1)(B)(II).").    State Medicaid programs will not reimburse a claim submitted for a

particular drug unless it has been prescribed for a medically accepted indication for that drug.

### a.    Medicaid Provider Certifications

36.    Physicians and pharmacists make express and/or implied certifications in their

state Medicaid provider enrollment forms that they will comply with all federal and state laws

applicable to Medicaid.  The following are representative samples of the types of certifications

health care providers make when entering Medicaid Provider Agreements with the State Medicaid programs. While state Medicaid enrollment agreements are continually revised and updated, the certifications within these agreements, as described below, generally survive in similar form from revision to revision:

37. When a provider enters into the "Medi-Cal Provider Agreement" with the State of California's Health and Human Services Agency, the provider agrees under the Provider Attestation section that "compliance with the provisions of this agreement is a condition precedent to payment to the provider." Medi-Cal Provider Agreement, Item 40 Provider Attestation, at 8, (available on Medi-Cal's website and incorporated herein). The agreement's provisions include the provider's obligation to comply with the California Department of Health Care Services' rules, regulations and provisions found in Chapters 7 and 8 of the Welfare and Institutions Code as well as all federal laws and regulations governing and regulating Medicaid providers. Id. at 1, Item 2. Furthermore, the provider agrees not to engage in or commit fraud or abuse including fraud under applicable federal or state laws and abuse that would result in unnecessary costs to health care programs financed in whole or in part by the Federal Government or any state or local agency in California or any other state, or practices that are inconsistent with sound medical practices that result in reimbursement from health care programs financed in whole or in part by the Federal Government or any state or local agency in California or any other state. Id. at 3, Item 15. Under Item 19 - Prohibition of Rebate, Refund or Discount, the provider agrees "not to offer, furnish or deliver any rebate, refund, preference…or other gratuitous consideration in connection with the provision of health care services…or to take any other action or receive any other benefit prohibited by state or federal law." Id. at 4, Item 19. Finally, the provider agrees to comply with the Welfare and

Institutions Code billing and claims requirements, it's implementing regulations and the provider manual. *Id.* at 4, Item 24.

38.   The Colorado Medicaid Assistance Program "Provider Participation Agreement" requires the provider to "comply with applicable provisions of the Social Security Act, as amended; federal or state laws, regulations, and guidelines and Department rules." <u>Provider Participation Agreement</u>, Item A – Provider Participation, at 15, (available at Colorado Medicaid website and incorporated by reference herein).   Under Item K, the provider and person signing the claims or submitting electronic claims understand that "[T]he knowing submission of false claims or causing another to submit false claims may subject the persons responsible to criminal charges, civil penalties, and/or forfeitures." *Id.* at 16.   Moreover, the "Provider Signature Page" states that by executing Colorado's Provider Agreement, the provider understands "that any false claims, statement, documents, or concealment of material fact may be …prosecuted under applicable federal and state laws." *Id.* at 20.

39.   The State of Delaware requires providers to enter into a "Contract for Items or Services Delivered to Delaware Assistance Program Eligibles in the Department of Health and Social Services" with the Department of Health and Social Services, Division of Medicaid and Medical Assistance, Delaware Medical Assistance Program ("DMAP").   By signing the contract, the provider agrees to abide by and comply with DMAP's rules, regulations, policies and procedures as well as the terms of the Social Security Act. <u>Contract for Items or Services Delivered to Delaware Assistance Program Eligibles in the Department of Health and Social Services</u>, Section 1 <u>Applicable Laws and Regulations</u>, at 1, (available at the Delaware Medicaid website and incorporated by reference herein).   Furthermore, the provider's submission of any claim for payment will constitute certification by the provider that the items

and services for which the claim for payment is submitted were in compliance with the DMAP rules, regulations, and policies, including certification that the services were actually provided and medically necessary.  *Id.* at 2, Section 3 <u>Payment for Items or Services</u>.

40.    A provider who signs the District of Columbia's "Department of Health Medical Assistance Administration Medicaid Provider Agreement" agrees "to satisfy all requirements of the Social Security Act, as amended, and be in full compliance with the standards prescribed by Federal and State standards."  <u>Department of Health Medical Assistance Administration Medicaid Provider Agreement</u>, General Provisions C, at 20 (available at the District of Columbia Medicaid website and incorporated by reference herein).

41.    The State of Florida's "Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for medical, medical-related, and waiver-related services provided to Medicaid recipients.   Under Section VII – Certification, of the Application, in order to be eligible to receive direct or indirect payments for services rendered to Florida Medicaid Program recipients, a provider must certify that the provider understands "that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws."  <u>Florida Medicaid Provider Enrollment Application</u>, Section VII Certification, at 9 (available at the Florida Medicaid website and incorporated herein).  Furthermore, Section 409.907 of Chapter 409, Social and Economic Assistance of the Florida Statutes, which governs the Florida Medicaid provider agreements, provides that an individual or entity with a provider agreement in effect will only receive payment for services rendered to Medicaid recipients, if that provider is "performing services or supplying the goods in accordance with federal, state and local laws…."  FLA. STAT. § 409.907.

14

42.    In Hawaii, a health care provider signs the "Hawaii State Medicaid Program Provider Agreement and Condition of Participation" and agrees to abide by the applicable provisions of the Hawaii State Medicaid Program as set forth in the Hawaii Administrative Rules, Title 17, Subtitle 12 and the applicable provisions of the Code of Federal Regulations relating to the Medical Assistance Program.    Hawaii State Medicaid Program Provider Agreement and Condition of Participation, Section 1, at 5 (available at the Hawaii Medicaid website and incorporated herein)..  Additionally, under Part C of the agreement, the provider understands that the provider may be suspended or terminated from participation in the Medicaid program for violations of the provisions of H.A.R. Subtitle 12, Chapter 17-1704 pertaining to Provider Fraud and Chapter 17-1736 pertaining to Provider Provisions.  Id. (Part C), at p. 7..

43.    Under the Illinois "Agreement for Participation Illinois Medical Assistance Program," a provider who wishes to submit claims for services rendered to eligible Healthcare and Family Services clients agrees, on a continuing basis, to comply with "Federal standards specified in Title XIX and XXI of the Social Security Act and with all other applicable Federal and State laws and regulations."    State of Illinois Department of Healthcare and Family Services Agreement for Participation Illinois Medical Assistance Program, Item 3, at 1 (available at the Illinois Medicaid website and incorporated herein).  .  Moreover, the provider agrees "to be fully liable for the truth, accuracy and completeness of all claims submitted…to the Department for payment."  Id. at 1, Item 6.  Additionally, the Provider acknowledges that all services provided will be in compliance with such laws and the applicable provisions of the Illinois Healthcare and Family Services Medical Assistance Program handbooks and that such compliance is "a condition of payment for all claims submitted."  Id.  The provider further

agrees that "[A]ny submittal of false or fraudulent claim or claims or any concealment of a material fact may be prosecuted under applicable Federal and State laws." _Id._

44.     When signing the "Indiana Health Coverage Programs Provider Agreement," a provider agrees "to comply with all federal and state statutes and regulations pertaining to the Indiana Health Coverage Programs, as they may be amended from time to time."   IHCP Provider Agreement, at 17, Item 1 (available at the Indiana Medicaid website and incorporated herein).  The provider also understands that "the submission of false claims, statements, and documents or the concealment of material fact may be prosecuted under the applicable federal and/or state laws." _Id._ at 19, Item 143.  Moreover the provider agrees "[A]s a condition of payment…to abide by and comply with all the stipulations, conditions and terms set forth" in the agreement.  _Id._ at p. 20.  Furthermore, Indiana regulations state that "A provider who accepts payment of a claim submitted under the Medicaid program is considered to have agreed to comply with the statutes and rules governing the program."  IND. CODE § 12-15-21-1 (2011).

45.     The Louisiana Medical Assistance Program Integrity Law (MAPIL), codified in LSA-RS-46:437.1 – 46:440.3, statutorily establishes that the Louisiana Medicaid PE-50 Provider Enrollment Agreement is a contract between the provider and the Louisiana Department of Health and Hospitals.  The MAPIL provides that "the department shall make payments from the medical assistance funds…to any person who has a provider agreement with the department and who agrees to comply with all federal and state laws and rules pertaining to the medical assistance programs."   LSA-RS-46.437.11A.  Additionally, by signing the "PE-50 Addendum-Provider Agreement," the provider certifies that the provider understands all claims paid will be from Federal and State Funds, and any false claims,

16

statements or documents or concealment of fact may be prosecuted under applicable Federal and State laws. PE-50 Addendum – Provider Agreement, at 2, Items 21 and 23 (available at the Louisiana Medicaid website and incorporated herein).

46. In Massachusetts, pharmacies sign agreements with MassHealth, the Massachusetts Medicaid program. Massachusetts regulations require "all pharmacies participating in MassHealth [to] comply with the regulations governing MassHealth, including but not limited to MassHealth regulations set forth in 130 CMR 406.00 and 450.00." 130 CMR 406.401. Massachusetts regulations also state that Mass Health will pay for physician services provided to members, "subject to the restrictions and limitations described in the MassHealth regulations." 130 CMR 433.402. MassHealth regulation, 130 CMR 450.261, requires all providers to comply "with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, specifically including but not limited to 42 U.S.C. § 1320a-7b [the Federal Anti-Kickback Statute]."

47. A provider agreeing to the Minnesota Health Care Program's "Provider Agreement" agrees to "comply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services." Minnesota Health Care Programs Provider Agreement, at 1, Item 2, (available at the Minnesota Medicaid website and incorporated herein).

48. Under the Montana "Medicaid Provider Enrollment Application", the provider, "IN CONSIDERATION OF MEDICAID PAYMENTS MADE FOR APPROPRIATE MEDICALLY NECESSARY SERVICES RENDERED TO THE ELIGIBLE CLAIMANTS . . . ." agrees to comply with "all applicable laws, rules and written policies pertaining to the Montana Medicaid Program including but not limited to Title XIX of the Social Security Act,

the Code of Federal Regulations, Montana Codes Annotated, Administrative Rules of Montana and written Department of Public Health and Human Services policies." Montana Medicaid Provider Enrollment Application, at 4 (available at the Montana Medicaid website and incorporated herein). Furthermore, the provider understands "THAT PAYMENTS OF CLAIMS WILL BE FROM FEDERAL AND STATE FUNDS AND THAT ANY FALSIFICATION OR CONCEALMENT OF A MATERIAL FACT MAY BE PROSECUTED UNDER FEDERAL AND STATE LAW." *Id.* at 5. Moreover, the Montana regulations require providers to "comply with all applicable state and federal statutes, rules and regulations, including but not limited to federal regulations and statutes found in Title 42 of the Code of Federal Regulations and the United States Code governing the Medicaid Program and all applicable Montana statutes and rules governing licensure and certification." MONT. ADMIN. R. 37.85.401 (2011).

49. The Magellan Medicaid Administration administers the Nevada Medicaid program on behalf of the state and provides the Provider Enrollment Agreement. Under this agreement the provider is "responsible for the presentation of true, accurate and complete information on all invoices/claims submitted to the Magellan Medicaid Administration." Magellan Medicaid Administration Provider Enrollment Application, Declaration – For all Providers, at 6 (available at the Nevada Medicaid website and incorporated herein). Additionally the provider "understands that payment…of those claims will be from Federal and State funds and that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable Federal and State laws." *Id.* Moreover, the provider also enters the "Nevada Medicaid and Nevada Check Up Provider Contract" with the State of Nevada Division of Health Care Financing and Policy, wherein the Division agrees to only

18

provide payment for services that are "timely claimed, and actually and properly rendered by Provider in accordance with federal and state law and the state policies and procedures set forth in the Medicaid Services Manual, Nevada Check Up Manual and Nevada Medicaid Billing Manual. Other claims are not properly payable Division claims." Nevada Medicaid and Nevada Check Up Provider Contract, Section 2 – Reimbursement, at 2. The provider is made responsible for the validity and accuracy of its claims. Id.

50. In New Hampshire, the provider signs the "New Hampshire Medicaid Program Provider Enrollment Agreement" and certifies to "abide by all rules, regulations, billing manuals, and bulletins promulgated by the Department pertaining to the provision of care or services under NH Title XIX and the claiming of payments for those services." New Hampshire Medicaid Program Provider Enrollment Agreement, at 1, (available at the New Hampshire Medicaid website and incorporated herein).

51. A provider, when signing the New Jersey Department of Health and Senior Services' "Provider Agreement Between New Jersey Department of Health and Senior Service and Provider," agrees "to comply with all applicable State and Federal Medicaid laws and policies, and rules and regulations promulgated pursuant thereto . . . ." and agrees "to comply with Section 1909 of P.L. 92-603, Section 242(c) which makes it a crime for persons found guilty of making any false statement or representation of a material fact in order to receive any benefit or payment under the Medicaid Assistance program…." Provider Agreement Between New Jersey Department of Health and Senior Service and Provider, at 1, Items 1 and 5 (available at the New Jersey Medicaid website and incorporated herein).

52. When a provider signs the New Mexico "Medical Assistance Division Provider Participation Agreement, the provider "AGREES TO ABIDE BY AND BE HELD TO ALL

FEDERAL, STATE, AND LOCAL LAWS, RULES AND REGULATIONS, INCLUDING, BUT NOT LIMITED TO THOSE PERTAINING TO MEDICAID AND THOSE STATED HEREIN." State of New Mexico Human Services Department Medical Assistance Division Provider Participation Agreement, at 6 (available at the New Mexico Medicaid website and incorporated herein). Furthermore, the New Mexico regulations state that "A provider who furnishes services to a Medicaid eligible recipient agrees to comply with all federal and state laws, regulations, and executive orders relevant to the provision of services." N.M. CODE R. § 8.302.1.11 (2011).

53. Under the New York State Medicaid program's "Physician Request for Enrollment," a provider agrees to "comply with the rules, regulations, and official directives of the Department …" New York State Medicaid Physician Request for Enrollment, at 5 (available at the New York Medicaid website and incorporated herein).

54. Under North Carolina's "Provider Administrative Participation Agreement," a provider may submit claims to the state Medicaid program either through electronic or paper claims submission process. As consideration for the right to submit paperless claims, the provider agrees to "abide by all Federal and State statutes, rules, regulations and policies…of the Medicaid program …." By submitting electronic claims, the provider agrees that "[A]ny false statement, claims or concealment of or failure to disclose a material fact may be prosecuted under applicable federal and/or state law (P.L. 95-142a and N.C. G.S. 108A-63)…." North Carolina Medicaid Provider Enrollment Agreement, Electronic Claims Submission (ECS) Agreement, at 1, Items 1 and 2 (available at the North Carolina Medicaid website and incorporated herein). Additionally, the provider agrees when filing non-electronic Medicaid claims, that "payment of claims will be from federal, state and local tax funds and

any false claims, statements, or documents or concealment of a material fact may be prosecuted under applicable Federal and State laws …" *Id.*

55.     The provider entering into the "State of Rhode Island Executive Office of Health and Human Services Provider Agreement Form" agrees to "follow all laws, rules, regulations, certification standards, policies and amendments including but not limited to the False Claims Act, and HIPAA, that govern the Rhode Island Medical Assistance Program as specified by the Federal Government and the State of Rhode Island." State of Rhode Island Executive Office of Health and Human Services Provider Agreement Form, at 1, Item 1 (available at the Rhode Island Medicaid website and incorporated herein).

56.     In Tennessee, a provider enters the State of Tennessee's "Department of Finance and Administration Provider Participation Agreement Medicaid/TennCare Title XIX Program" in order to participate in the Tennessee Medicaid health care program.  By signing the agreement, the applicant agrees to, among other things, "comply with all contractual terms and Medicaid policies as outlined in Federal and State rules and regulations and Medicaid provider manuals and bulletins." State of Tennessee The Department of Finance and Administration Provider Participation Agreement Medicaid/TennCare Title XIX Program, at 1, Item 7 (available at the Tennessee Medicaid website and incorporated herein).

57.     In the State of Texas, Medicaid Provider Enrollment Application providers certify that "concealment of a material fact, or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law." Texas Medicaid Provider Enrollment Application, at p. 6.5 (available at the Texas Medicaid website and incorporated herein). Providers further certify that "any falsification, omission, or misrepresentation in connection with…claims filed may result in all paid services declared as an overpayment and subject to

21

recoupment." *Id.* Providers also certify that they will comply with the requirements of the enrollment agreement, including "federal laws and regulations relating to fraud, abuse and waste in health care and the Medicaid program." *Id.* at p. 6.2, 6.5. The Texas Medicaid enrollment agreement requires signatories to notify the State of Texas if they fall out of compliance with any of their obligations. *Id.*

58. Providers of medical services in the Commonwealth of Virginia, including physicians and pharmacists, must also sign a Participation Agreement. This agreement requires the provider to certify that when participating in the Virginia Medical Assistance Program the "provider agrees to comply with all applicable state and federal laws," including the Health Insurance Portability and Accountability of Act of 1996 and all administrative policies and procedures of the Virginia Medicaid Assistance Program. Commonwealth of Virginia Department of Medical Assistance Services Medical Assistance Program Participation Agreement, at 1, Item 8 (available at the Virginia Medicaid website and incorporated herein).

59. When a provider enters into the State of Washington's "Core Provider Agreement" with the state's Department of Social and Health Services, the provider agrees under the Certification section "to abide by . . . all applicable federal and state statutes, rules, and policies. Core Provider Agreement, Section 15 Certification, at 3, hrsa.dshs.wa.gov/forms/documents/09_048.doc and incorporated herein." The certification signature page states that federal regulations require contractors and bidders to sign and abide by the terms of the certification, without modification, in order to participate in certain transactions directly or indirectly involving federal funds. Id. at 12.

60. In Wisconsin, the "Provider Agreement" is a contract between a provider and the Wisconsin Department of Health Services that sets forth conditions of participation and

reimbursement. The provider's signature signifies acknowledgement that any statement or representation of a material fact made or caused to be made in the application or during the process "for a benefit or payment or made for the use in determining rights to such benefit or payment" that is false as defined by s.49.49(1) or (4m) of the Wisconsin statutes subjects the provider to criminal or other penalties." Wisconsin Medicaid Provider Agreement and Acknowledgement of Terms of Participation, at 3 (available at the Wisconsin Medicaid website and incorporated herein).

61. In addition, every time they submit an electronic claim for reimbursement by the state Medicaid programs pursuant to an electronic claims submission agreement, physicians and laboratories also make express and/or implied certifications that they are complying with state and federal laws applicable to the Medicaid program and that there has not been a material omission. Florida Medicaid's provider enrollment form, for instance, includes a notice regarding the certifications to be contained in electronic submissions:

> Providers who choose to submit claims electronically, including pharmacies that use Point of Service (POS) devices, must be aware that payment of claims will be from federal and state funds and that any falsification or concealment of material fact may be prosecuted under Federal and State laws. Further, providers must understand and agree to the following:
> …
> • Abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid program.

Florida Medicaid Provider Enrollment Application at http://portal.flmmis.com/FLPublic/Portals/0/StaticContent/Public/Public%20Misc%20Files/Dece mber%202004%20App%20EDS%20Web%20Version%20062508.pdf, section 22, page 5 (*accessed* April 5. 2012).

62.    These certifications are "essentially identical" from state to state,[1] and their particulars are a matter of public record.  In *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 434-35 (3d Cir. 2004), for example, the court explained how this process works in the pharmacy context in New Jersey:

> After a Medicaid-provider pharmacy has supplied a medication to a Medicaid patient, the pharmacy submits a claim to Medicaid. Medicaid then pays the pharmacy for the medication. Instructions for filing Medicaid claims are set forth in New Jersey Medicaid's Pharmacy Services Fiscal Agent Billing Supplement (FABS). FABS instructs provider pharmacies to submit Medicaid pharmacy claims on the MC-6 form. The MC-6 claim form contains a "Provider Certification" which the provider must sign: I certify that the services covered by this claim were personally rendered by me or under my direct supervision ... and that the services covered by this claim and the amount charged thereof are in accordance with the regulations of the New Jersey Health Services Program; and that no part of the net amount payable under this claim has been paid; and that payment of such amount will be accepted as payment in full without additional charge to the patient or to others on his behalf.... I understand that ... any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable federal or State law, or both.

### ii.    Medicare Part D

63.    Medicare Part D is a federal program meant to subsidize the costs of prescription drugs for Medicare beneficiaries.  It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.  Part D only covers prescription drugs and will not assist with any other medical procedure (i.e. X-rays, doctor visits, etc.).  Among those individuals eligible for Medicare Part D are individuals with dual-eligibility, i.e., beneficiaries enrolled in both Medicare and Medicaid, who prior to 2006 had received outpatient drug benefits through Medicaid.  Although Medicare Part D is a component of Medicare, each of the fifty states and the District of Columbia are required to make a contribution to the United States government to defray a portion of the cost of

---

[1] See Common Opposition of the United States and the Intervening States to Johnson & Johnson's Motion to Dismiss, filed Aug. 6, 2010 in *United States ex rel. Lisitza v. Johnson & Johnson,* No. 1:07-cv-10288-RGS (Dist. Mass.) at 10.

Medicare Part D for beneficiaries whose Medicaid drug coverage has been assumed by Medicare Part D. 42 C.F.R. § 423.910(a) (2008).

64.    A Medicare beneficiary enrolled in Medicare Part D chooses a Prescription Drug Plan (PDP), which is administered by a private insurance company, or "sponsor," based upon the beneficiary's specific drug requirements.  Part D sponsors are required by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 to offer, at a minimum, a basic prescription drug benefit that is either the standard prescription drug benefit or is actuarially equivalent to the standard benefit.  The standard costs structure makes beneficiaries responsible for certain costs, which may include a monthly premium, an annual deductible, and coinsurance.

65.    In 2008, for example, the standard drug benefit had a beneficiary deductible of $275.  In the initial phase of the Part D benefit, after beneficiaries paid the deductible, they contributed 25 percent coinsurance toward their drug costs and the plan paid the remaining 75 percent until combined beneficiary and plan payments reached $2,510.  After combined payments reached $2,510, beneficiaries entered the coverage gap phase of the benefit, or "donut-hole," in which they were responsible for 100 percent of their drug costs.  The catastrophic coverage phase began when a beneficiary's out-of-pocket costs reached $4,050.  This amount included a beneficiary's deductible and coinsurance payments.  Once beneficiaries reached $4,050 in out-of-pocket costs, they contributed approximately 5 percent in coinsurance toward their drug costs.  Of the remaining 95 percent of drug costs, the Part D sponsors are responsible for approximately 15 percent while Medicare pays 80 percent.

66.    Before the beginning of the plan year, sponsors are required to submit a bid for each plan that they intend to offer.  The bid is an estimate of the average costs to provide the

basic benefit per beneficiary. Throughout the year, the Centers for Medicare & Medicaid Services ("CMS") makes prospective payments to sponsors for three subsidies based on sponsors' approved bids. These subsidies are: (1) the direct subsidy, (2) the reinsurance subsidy, and (3) the low-income cost-sharing subsidy. The direct subsidy, together with beneficiary premiums, is designed to cover the sponsor's cost of providing the benefit to each beneficiary. The reinsurance subsidy covers the Federal Government's share of drug costs for beneficiaries who have reached catastrophic coverage. The low-income cost-sharing subsidy covers the Federal Government's portion of the cost-sharing payments for certain low-income beneficiaries. At the end of the plan year, CMS reconciles these prospective payments with the actual costs incurred by the plan sponsors.

67. All Part D plan sponsors submit data and information necessary for CMS to determine and make payment. Every time a beneficiary fills a prescription covered under Part D, plan sponsors must submit a summary called the prescription drug event ("PDE") record. The PDE record contains drug cost and payment data that enable CMS to administer the Part D benefit. Part D plan sponsors submit one PDE record each time a Part D covered drug is dispensed to its enrollees, even for those events in which enrollees have 100 percent cost sharing (i.e., they are in the coverage gap or deductible phase).

68. CMS uses the National Council for Prescription Drug Programs industry standard for collecting PDE data. The PDE data contain information on the beneficiary, plan, pharmacy, and prescribing physician, as well as information about the event, including the date, quantity dispensed, number of days supplied, national drug code, control number, and the amount reimbursed to the pharmacy by the plan.

69.    Part D covered drugs are defined as drugs available only by prescription, which are used and sold in the United States and used for a medically accepted indication, biological products, insulin and vaccines.  *See* 42 C.F.R. § 423.100.  Medicare Part D's definition of a "medically accepted indication" is the same as Medicaid's: it is a use that is approved under the Federal Food, Drug, and Cosmetic Act, or "is supported by one or more citations included or approved for inclusion in" one of the drug compendia identified by the Medicaid statute (i.e., American Hospital Formulary Service Drug Information, DRUGDEX, and United States Pharmacopeia-Drug Information (or its successor publications)).  *See* 42 C.F.R. § 423.100, 42 U.S.C. §§ 1396r-8 (g)(1)(B)(i) and (k)(6).  As stated above, the United States Government interprets "supported by" to require "some form of corroboration or validation."  United States' Statement of Interest in Response to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint,  *United States ex rel. Rost v. Pfizer, Inc*., 03-CV-11084, at p. 5 (May 16, 2008); *see also* Centers for Medicare and Medicaid Release No. 141 (May 4, 2006) ("The statute requires coverage of off-label uses of FDA-approved drugs for indications that are supported (as opposed to listed) in the compendia specified in section 1927(g)(1)(B)(II).").

70.    Part D sponsors are responsible for ensuring that covered Part D drugs are prescribed for "medically accepted indications."  Some Part D sponsors use prior authorization programs to ensure drugs are being used for medically-accepted indications.  Subsys is commonly listed on PDP formularies for Medicare Part D and is reimbursable under many Medicare Part D plans across the country.

### a.  Medicare Certification

454.    Moreover, to participate in Medicare, providers, such as physicians and pharmacists, must first sign enrollment agreements.  These agreements require providers to

certify that they understand that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with . . . the Federal anti-kickback statute."

### iii. CHAMPUS/TRICARE, CHAMPVA, and Federal Employee Health Benefits Plan

71.    In addition to Medicaid and Medicare Part D, the federal and state governments reimburse a portion of the cost of prescription drugs under several other federal and state health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA, and the Federal Employees Health Benefits Plan.

72.    The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") and TRICARE, a continuation of CHAMPUS, are federally funded uniformed services health care programs for active duty and retired service members, members of the National Guard and Reserve, service members' families, survivors of service members, and certain former spouses of service members.  The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), is a federally funded healthcare program for the families and survivors of veterans who have been rated permanently and totally disabled for a service-connected disability and for the survivors of a military member who died in the line of duty, not due to misconduct.  The Federal Employees Health Benefits Plan is administered by the Office of Personnel Management and provides health insurance for federal employees, retirees, and survivors.  Coverage of prescription drugs under these programs is similar to coverage under the Medicaid program.  *See, e.g.*, 32 C.F.R. §§ 199.2 and 199.4(g)(15)(i); TRICARE Policy Manual 6010.54-M, Chapter 8, Section 9.1(B)(2) (August 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II.

### C. Prohibition of Kickbacks Associated with Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, and Federal Employee Health Benefits Plan Prescriptions

### i.     Federal Anti-Kickback Statute

73.    The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute ("Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), make it illegal for an individual knowingly and willfully to offer or pay remuneration in cash or in kind to induce a physician to order a good or service that is reimbursed by a federal healthcare program.  *See* 42 U.S.C. § 1320a-7b(b)(2).   "Remuneration" is broadly defined to include anything of value offered or paid in return for purchasing, ordering, or recommending the purchase or order of any item reimbursable by a federal healthcare program.  *See* Department of Health and Human Services, Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23734, 23737 (May 5, 2003).  Pursuant to the Patient Protection and Affordable Care Act, a violation of the Anti-Kickback Statute is a false or fraudulent claim for purposes of the FCA.  See P.L. 111-148, § 6402, codified at 42 U.S.C. § 1320a-7b(g).

74.    The purpose of the Anti-Kickback Statute is to prohibit such remuneration in order to secure proper medical treatment and referrals and to limit unnecessary treatment, services, or goods that are based not on the needs of the patient but on improper incentives given to others, thereby limiting the patient's right to choose proper medical care and services. *See* Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088, 3089 (proposed Jan. 23, 1989) (codified at 42 C.F.R. pt. 1001) ("[I]t is necessary for the fiscal integrity of the Medicare and Medicaid programs to assure that physicians exercise sound, objective medical judgment when controlling admittance [of new drugs and medical devices] to . . ." the medical marketplace.).

75.    Paying kickbacks taints an entire prescription, regardless of the medical propriety of its use.  The kickback inherently interferes with the doctor-patient relationship and creates a

conflict of interest, potentially putting the patient's health at risk. Any defendant convicted under the statute is automatically barred from participating in federal and federally-funded healthcare programs.

> **ii.** **OIG, PhRMA, AMA and ACCME's Guidelines on the Manufacturer-Doctor Relationship and Behaviors that Violate the Anti-Kickback Statute**

76. Recognizing that the Anti-Kickback Statute has been applied broadly, the OIG has acknowledged that liability under the statute will ultimately turn on intent. *See* Department of Health and Human Services, Office of Inspector General ("OIG") Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003). In order to assist pharmaceutical manufacturers, the OIG issued a guidance in May 2003 that not only stated its interpretation of the Anti-Kickback statute, but also highlighted activities that may give rise to liability under the statute. *See id.* The OIG Guidance also directed drug manufacturers to review the PhRMA Code, the ACCME standards relating to CMEs, and an ethical opinion issued in June 1992 and amended in April 2001 by the AMA stating its guidelines to govern doctors' acceptance of gifts from pharmaceutical manufacturers. *See* AMA Opinion 8.061 (1992, amended 2001); PhRMA Code (2003); ACCME Standards (2004). All of these industry guidelines draw plain lines of demarcation for acceptable and unacceptable behavior under the Anti-Kickback statute.

77. The OIG's Guidance addressed specific practices commonly arising in the relationship between a drug manufacturer and physicians that present problems. *Id.* at 23738. Of particular concern to the OIG were "preceptorships," educational and research funding, CMEs, consulting and advisory arrangements, and gifts of more than trivial value to physicians, such as entertainment, recreation, travel, and meals. *Id.* The OIG was also

30

concerned about payments to physicians to: 1) listen to sales representatives market their drugs, 2) access marketing web sites, or 3) perform "research" for drug manufacturers. *Id.*

78.   The AMA, PhRMA and ACCME guidelines have suggested similar limits on pharmaceutical activities.  Where the three guidelines share the same perspectives on improper activities, one can presume these activities are likely to violate the federal Anti-Kickback statute.[2]

79.   The issuance of these guidelines by the OIG, AMA, PhRMA and ACCME, in addition to the enactment of the Anti-Kickback Statute itself, demonstrates that federal and state health care programs consider compliance with the Anti-Kickback Statute a prerequisite to receiving or retaining reimbursement payments from Medicaid, Medicare Part D, and other federal health care programs.

## VI.   FACTUAL ALLEGATIONS AND INSYS THERAPEUTICS, INC.'S SCHEME TO SELL SUBSYS THROUGH OFF-LABEL MARKETING AND ILLEGAL KICKBACKS

### A.   Breakthrough Cancer Pain Management and Subsys Overview

80.   Subsys (scientific name fentanyl), manufactured and marketed by Insys, is a sublingual spray first approved for use in the United States on January 4, 2012.  Ex. 1, Jan. 4, 2012 FDA Approval Letter.

81.   According to the current, approved label, Subsys is "an opioid agonist indicated for the management of breakthrough pain in cancer patients 18 years of age or older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."  *See* Ex. 2, Subsys Label, at 1.  Below the label's indication is a bold-typed section entitled "Warning: Risk of Respiratory Depression, Medication Errors, Abuse Potential," which warns that fatal respiratory depression has occurred in patients treated with transmucosal

---

[2] The three guidelines all address several pharmaceutical activities, such as gifts, entertainment, conferences, CMEs, and consultants.  The ACCME standards address only CME activities.

immediate-release fentanyl products such as Subsys, including following use in opioid non-tolerant patients and ***improper dosing***." *See id.* at 3 (emphasis added). The warning states that "When prescribing, do not convert patients on a mcg per mcg basis from any other fentanyl products to Subsys." *Id.* In the section entitled "Indication and Usage," the label states that "Subsys is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain."

82. Subsys is supplied in a carton containing six blister packages containing single spray unites of Subsys and a supply of small disposal bags for disposing of used Subsys units. Ex. 2, Subsys Label, at 24. Subsys is administered by spraying the drug underneath the tongue. Each spray contains doses of 100 mcg, 200 mcg, 400 mcg, 600 mcg, or 800 mcg. *Id.*

### *Dosage*

83. According to its label, doctors should individually titrate Subsys to a dose that provides adequate pain relief for the patient and minimizes side effects. *Id.* at 4. The label indicates that the initial dose of Subsys to treat breakthrough cancer pain is "**always** 100 mcg." *Id.* The label further warns that when doctors prescribe the medication, "**do not switch patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS** as SUBSYS is not equivalent on a mcg per mcg basis with any other fentanyl product." *Id.* The label also provides a step-by-step guide to titrating the dose of Subsys. *Id.* at 5. The patient should take a 100 mcg dose when the breakthrough pain episode occurs. If the pain is not relieved after 30 minutes, the patient may take only one additional dose of the same strength for that episode. The patient must then wait four hours before treating another episode of breakthrough pain. If the 100 mcg dose does not adequately relieve the patient's

pain, the doctor can prescribe 200 mcg of Subsys. The subsequent dosages in the titration cycle are 400 mcg, 600 mcg, 800 mcg, 1200 mcg, and 1600 mcg. The label cautions that "To reduce the risk of overdose during titration, patients should have only one strength of Subsys available at any time." *Id*.

### *Safety concerns*

84. Because Subsys has such a high potential for abuse and high risk profile, Subsys may only be dispensed to patients enrolled in the Transmucosal Immediate-Release Fentanyl ("TIRF") Risk Evaluation and Management Strategy ("REMS") access program. Under 21 U.S.C. § 355-1, part of the Food and Drug Administration (FDA) Amendments Act of 2007, the FDA can require, post approval, the submission of a Risk Evaluation and Mitigation Strategy (REMS) "to ensure that the benefits of the drug outweigh the risks of the drug." On December 28, 2011, the FDA announced a shared REMS for all TIRF products. Instead of needing to enroll in separate REMS for each of the TIRF products, prescribers and pharmacists could now enroll in the single shared TIRF REMS program.

85. The goals of the TIRF REMS access program are to provide patients access to important medications while limiting the potential risks for abuse and misuse of the drugs. The TIRF REMS program seeks to accomplish this goal through: "prescribing and dispensing TIRF medicines only to appropriate patients, including use only in opioid-tolerant patients; preventing inappropriate conversion between fentanyl products; preventing accidental exposure to children and others for whom TIRF medicines were not prescribed; [and] educating prescribers, pharmacists, and patients on the potential for misuse, abuse, addiction, and overdose." Press Release, U.S. Food & Drug Administration, FDA Approves Shared

33

System REMS for TIRF Products (December 29, 2011), *available at* http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm285345.htm.

86.  To prescribe or dispense TIRF products, physicians and pharmacists must be enrolled in the TIRF REMS Access Program. To become certified to prescribe TIRF medications, prescribers must: 1) Review the TIRF REMS Access education materials, including the Full Prescribing Information (FPI) for each TIRF medicine, and successfully complete the Knowledge Assessment, and 2) Complete and sign the Prescriber Enrollment Form. FOOD & DRUG ADMINISTRATION, TRANSMUCOSAL IMMEDIATE RELEASE FENTANYL (TIRF) RISK EVALUATION & MITIGATION STRATEGY (REMS) 5 (2012), *available at* http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatient sandProviders/UCM289730.pdf. Prescribers are required to re-enroll every two years. *Id*. Additionally, prescribers must re-counsel their patients and complete a new Patient-Prescriber Agreement Form every two years. *Id*.

87.  Pharmacies must be enrolled in the TIRF REMS Access Program to dispense TIRF products. Each pharmacy will be required to designate an authorized pharmacy representative (chain pharmacy) or authorized pharmacist (outpatient and inpatient pharmacies) to complete enrollment on behalf of the pharmacy. The requirements for enrollment in the TIRF REMS Access Program differ for a pharmacy depending on whether it is an outpatient pharmacy, closed system pharmacy, or inpatient pharmacy. Pharmacies (authorized pharmacist) are required to re-enroll every two years. *Id*.

**B.  Relator Furchak's Discovery of Insys's Nationwide Kickback Scheme and Off-Labeling Marketing Strategies**

      **i.  Relator Furchak's Discovery of Insys's Nationwide Kickback Scheme**

88.     In January, 2012, Insys prepared for Subsys's launch with the expectation that the drug would be a blockbuster that would compete strongly against Cephalon's Actiq and Fentora.  Furchak was hired as part of the company's sales force expansion in anticipation of Subsys's launch.  When Relator Furchak joined Insys in February, one month before its launch of Subsys at the end of March 2012, he was one of forty-five sales representatives hired to market Subsys to about 1500 doctors nationwide. Most of the sales representatives were recent college graduates and people, like Furchak, switching from non-pharmaceutical sales jobs to their first pharmaceutical sales representative position.  Furchak's sales territory is Houston, Texas and its surrounding area. He is part of the Southeast Region, which includes Furchak's territory, Alabama, Mississippi, North Carolina, South Carolina, Georgia, and Florida.

89.     Relator Furchak first learned of Insys's Subsys speaker programs in March 2012 when Insys was gearing up for the launch of Subsys.  Relator Furchak's regional manager at the time, Tony Bryant, told the Southeast Region sales representatives, including Furchak, Lacy Fortenberry, Abigail "Abby" Carr, Maria "Mia"  Guzman, Rob Davis, Jen Wolf, Nick Duffy, Jim Coffman, and Tracy Krane that they should recruit doctors to be speakers for Subsys.  Bryant did not, however, heavily push the representatives to do speaker programs.

90.     By June 2012, however, it became clear that Subsys was not generating the expected sales.  In response, Insys fired approximately twenty-five percent of its newly hired sales representatives, quickly replacing them with more experienced pharmaceutical sales representatives.  Around this same time, Insys fired its Vice President of Sales, and Furchak's regional manager, Tony Bryant, resigned.  The next day, Furchak learned that Alec Burlakoff, a former regional sales manager at Cephalon, had been hired to be his new regional manager. It was at this time when Furchak first became aware that something was not right at Insys.

Furchak learned of Insys's new push to drive sales: focus on speaker programs to induce prescription writing and market off-label messages to physicians, both of which are set forth in detail below. This was the beginning of Insys's nationwide kickback scheme.

91.  Insys's speaker program was a poorly disguised kickback. Insys hired selected doctors to give talks in promotional settings about Subsys. Insys sought "coachable" doctors willing to laud Subsys's effectiveness to other doctors. In addition, speakers were offered honoraria, ranging from $800 to $1200 per program, for their speaking engagements. Insys's payments to these doctors greatly exceeded the fair market value and reasonable compensation ordinarily given to a speaker in a typical arms-length transaction, particularly as presentations were often short and the audiences small.

92.  Some speakers were chosen as a reward for prescribing drugs. In fact, as soon as Alec Burlakoff took over as Southeast Regional Sales Manager in June 2012, Burlakoff told the sales representatives under his direction that "speaker programs would be the key to their success" and that "the purpose of the speaker programs was to get money in the doctor's pocket." Before Burlakoff joined Insys, in April 2012, Relator Furchak had cultivated a relationship with Dr. Benny Sanchez, a pain management doctor in Houston, Texas. Thinking that Dr. Sanchez was a stand-up, honorable physician, Relator Furchak had asked Dr. Sanchez to be a speaker for Subsys, and Dr. Sanchez had agreed. On August 8, 2012, Furchak scheduled Dr. Sanchez's first speaker program, which was a one-attendee speaker dinner with Dr. Hede, a pain management doctor, at Kirby's Steakhouse in The Woodlands, Texas. Thinking that this dinner had been a success, Furchak scheduled four more small speaker dinner programs for Dr. Sanchez. At this point, Burlakoff texted Furchak telling him to "[p]lease be sure he [Dr. Sanchez] is writing more and more subsys (sic) to justify these

programs. You don't want to go too far out on a limb…You have to have that uncomfortable conversation which holds him accountable." Ex. 3, Aug. 16, 2012 texts between Burlakoff and Furchak. Furchak became concerned about his use of Dr. Sanchez as a speaker and sought to confirm with Burlakoff that he could continue with the dinner program scheduled for Dr. Sanchez and one attendee, Dr. Incalcaterra for August, 2012. *Id*. Burlakoff responded that Furchak could have that dinner, but that "Dr (sic) sanchez (sic) needs to find 1 pt [patient] a day..Please do not book any additional programs until we see return on investment." *Id*.

93.    Later in the day, Burlakoff told his team that speaker programs were being placed on hold while SciMedica, the outside scheduling and training company that Insys was using to train its speakers and schedule their programs, changed the slide decks for the speakers. He informed his team that he would advise them "not to fight too hard for a program next week to take place (if the speaker is not already writing a lot of subsys(sic)) you may not want to go too far out on a limb." *Id*. Burlakoff continued, stating that they could inform their speakers that "'they,'" presumably management, were "already beginning to cancel, change re-allocate (sic) program dollars away from those trained speakers whom have very little clinical experience. Per 'Dr. Kapur', subsys (sic) speakers should support and show belief in this product. If not- the speaker needs to be removed." *Id*.

94.    Following this message, Furchak once again asked Burlakoff if he needed to cancel his dinner program with Dr. Sanchez. Burlakoff responded that the program was a "go, "But – he seriously needs to start writing or it is going to make us look bad. I would definitely make this the last program 'for now' until you see his numbers increase significantly..(sic) He should have written much more after our dinner program." *Id*. Burlakoff further stated that "Speakers should be writing 1 a day." *Id*.

95.   On August 30, 2012, Burlakoff again addressed the issue of speaker programs with his team.   Ex. 4, Aug. 30, 2012 text from Burlakoff to Southeast Region sales representatives.   Burlakoff stated that the region's numbers were flat and down for the past three weeks.   He stated that the team should be concerned as they had done a lot of speaker programs and they were still flat on sales and that the problem needed to be addressed and corrected.   He asked "Are our speakers doing their part????   We must hold our speakers accountable, programs are going to begin to get cancelled quickly."   *Id*.   Two weeks later, Burlakoff again texted the Southeast Region sales team and warned that the sales representatives, including Furchak, must "keep a very close eye on [their] speakers.   If they are not increasing their clinical experience, please cancel, suspend, and cease doing speaker programs."   *Id*.

96.   During this timeframe, Furchak became concerned that his speaker, Dr. Sanchez, was not meeting Burlakoff's standards.   He therefore cancelled three or four scheduled dinner programs with Dr. Sanchez.   Burlakoff praised Furchak for the move on a weekly call with the team as Dr. Sanchez was not writing enough prescriptions.

97.   Shortly thereafter, on September 12, 2012, Burlakoff was promoted to Vice President of Sales.   As Vice President of Sales, Burlakoff continues to push the message that speakers should be writing one prescription a day in order to remain a Subsys speaker, particularly in light of Dr. Kapoor's view that speakers should have clinical experience with Subsys or be removed from the speaker program.

98.   On September 19, 2012, Insys held a national meeting for all of its sales representatives in Phoenix, Arizona, where Insys's headquarters are located.   The same day, Joe Rowan, who took over as  the Southeast Regional Manager for Insys, sent an e-mail to the

Southeast Region sales representatives, including Furchak, stating that they each needed to schedule six speaker programs over the next two weeks. Furchak then told Rowan that he may not be able to meet this goal as Burlakoff had a problem with Furchak using Dr. Sanchez. When Rowan asked why, Furchak explained that Dr. Sanchez had not been writing more prescriptions after becoming a speaker. Rowan responded that if he is "not putting pen to paper, we need to get rid of him" and that Furchak should use another doctor.

99. Insys's kickback strategy raised the total cost assumed by Medicare, Medicaid, Tricare, and other federal healthcare programs because doctors, blinded by Insys's remunerations, prescribed Subsys: (a) when they would not have otherwise if not for the kickbacks; or (b) when medically unnecessary and ineffective. Because Insys's kickback scheme was intertwined with its off-label promotion of Subsys, the off-label prescriptions for Subsys capture not only the cost to Medicare, Medicaid, Tricare, and other federal healthcare programs of Insys's off-label marketing but also profits tainted by kickbacks.

  **ii.**  **Relator's Discovery of the Nationwide Off-Label Marketing Scheme**

100. Shortly after Subsys's launch, Insys committed to a nationwide marketing campaign that, as it well knows, diverges from Subsys's FDA-approved label in a numerous respects. First, Insys misbrands Subsys for indications not approved by the FDA, including the use of Subsys in non-cancer patients and for diagnoses unrelated to cancer pain. Second, Insys encourages doctors to start patients at a dosage of 400 mcg rather than 100 mcg as spelled out on Subsys's label.

101. Furchak personally witnessed that the following members of the Insys's management—which includes Southeastern regional manager as well as national managers—participated in the nationwide off-label marketing scheme or knew of it yet did nothing to limit

it: (1) Furchak's direct supervisor, Southeast Regional Sales Manager, Alec Burlakoff, who was promoted to Vice President of Sales on September 12, 2012; and (2) Michael Babich, President and CEO of Insys.

### a. Subsys's Targeted Population

102. Insys also increased its market share by targeting all pain management patients, not just patients experiencing breakthrough cancer pain. Insys misbranded Subsys by promoting it as a drug as being able to be used the same way as its competitor products, Actiq and Fentora, drugs promoted by Cephalon, taking advantage of Cephalon's illegal off-label promotion of Actiq. In 2008, Cephalon agreed to a $425 million settlement of allegations that Cephalon promoted Actiq for all types of pain, using the mantra "pain is pain," although Actiq was only approved for the treatment of breakthrough cancer pain. Insys is attempting to piggyback on the off-label usage of its competitor's products in an effort to persuade doctors to use Subsys in the same off-label manner. Since its launch of Subsys, Insys management has been directing sales representatives to inform doctors that Subsys is for the treatment of any kind of breakthrough pain in cancer patients. In other words, if a cancer patient sustains a leg injury in a car accident and is suffering pain from the injury, a doctor may use Subsys to treat the pain. Insys's off-label message is clear: Subsys should be used to treat any kind of breakthrough pain, not just cancer pain. This message is in direct contradiction to Subsys's label, which states that Subsys is indicated for the management of "breakthrough cancer pain" or "breakthrough pain in cancer patients." In fact, the Subsys label warns in bold lettering: "Due to the risk of respiratory depressions, Subsys is contraindicated in the management of *acute or postoperative pain* including headache/migraine and in opioid non-tolerant patients." Ex. 2, Subsys Label, at *3.

103. Relator Furchak, however, continued to see a push by Insys management to "educate" doctors on the use of Subsys to treat all types of pain. For example, in August 2012, Alec Burlakoff, then the Southeast Regional Sales Manager, accompanied Furchak on a sales call to see a pain management doctor in Houston, Texas. During the call, the doctor asked Furchak and Burlakoff about Subsys's indication. Burlakoff, apparently taking a page from his Cephalon days, responded "Well, doctor, why do you care about indication? You can write Subsys for off-label use. I can't talk to you about indications with you, but you can write off-label." The doctor replied that "insurance companies care about indication." Burlakoff retorted that "insurance companies do not care about indication and that eighty percent of Subsys prescriptions are off-label."

104. On September 19, 2012, Insys held a national meeting for all of its sales representatives in Phoenix, Arizona. At this meeting, Brook Smets, a sales representative for Insys's West Region, asked Insys management how the representatives should approach doctors regarding the fact that eighty percent of Subsys prescriptions are off-label. A member of Insys's management responded that representatives should explain to their doctors that the evidence shows that "breakthrough pain is the same as breakthrough cancer pain."

105. Insys structured its sales force to aggressively push the off-label marketing scheme. Insys had its sales force use a physician target list or "call plan," containing the names of doctors to whom each sales representative should promote the off-label message about Subsys. Furchak and his fellow representatives in the Southeast Region, Lacy Fortenberry and Abby Carr, marketed Subsys primarily to pain management doctors, although some oncologists appeared on their lists as lower level targets.

106. Insys used deciles and prescribing habits to tailor its off-label promotion strategy to specific doctors. The doctor's placement on the continuum or in a category depended on how likely the doctor was to prescribe Subsys.

107. Sales representatives use an electronic call note system to track their calls on target doctors, but that system no longer allows for any free typing; it is essentially multiple choice in form. The content of sales conversations is therefore, purposefully, not documented.

**b.      Subsys "Effective Dose" Message**

108. As already noted, the FDA approved Subsys on January 4, 2012. The Subsys label explained that patients should be started on the lowest dose of 100 mcg and titrated to a dose that adequately relieves the patient's breakthrough cancer pain. It quickly became clear to Insys that the 100 mcg starting dose was not going to make Subsys the blockbuster drug that Insys expected Subsys to be. By early September 2012, driven by low sales for Subsys, Insys began pushing its "effective dose" message.

109. On September 13, 2012, all Insys sales representatives, including Furchak, received an email from Matthew Napoletano, Vice President of Marketing of Insys, and Michael Babich, President and CEO of Insys, that management was tweaking the dosage message. Ex. 5, page 4 - Sept. 13, 2012 email from M. Napoletano and M. Babich to Insys sales team. Napoletano and Babich explained that sales representatives should inform their physicians that they should write a prescription for thirty units of Subsys, so that the patient can be titrated more quickly to the "effective dose." *Id*. They further stated that sales representatives would receive a new "Effective Dose" brochure at a national sales meeting in Phoenix on September 19, 2012. The brochure would show "how 6 units of 100 mcg can

titrate a patient to 400 mcgs, and how 6 units of 200 mcg can titrate a patient to 800 mcgs. . . .a great selling tool for you to drive home the importance of finding an effective dose." *Id.*

110. The very same day, Alec Burlakoff, then Southeast Regional Sales Manager, sent an e-mail to the Southeast Region sales representatives, including Furchak, and copying Babich, Napoletano, and Dr. Kapoor at his EJ Financial Enterprises address, telling the representatives that "every time you receive a message from Xun [Sean Yu] indicating that you had a prescription written for less than 400 mcg …you must follow up with the physician within 24 hours and provide specific details to the conversation." Ex. 6. Burlakoff further stated that "100 mcg and 200mcg (sic) of Subsys does NOT work. We would be better off having the doctor write a prescription for one of our competitors rather than write for 100mcg(sic) or200mcg(sic) of Subsys. At least then – we would theoretically still have a chance of proving our drug to be efficacious if and when we sell the doctor on 'effective dosing'." *Id.* Burlakoff further warned that "anyone whom ignores these instructions is subject to immediate negative consequences…." *Id.*

111. Four days later, all the sales representatives throughout the country received an e-mail from Alec Burlakoff, the newly promoted Vice President of Sales, copying Babich and Napoletano and explaining that sales representatives would now be receiving an e-mail every time a prescriber in their territory wrote a Subsys prescription at 100 mcg or 200 mcg. Ex. 5, Sept. 17, 2012 e-mail from A. Burlakoff to all Insys sales representatives. Burlakoff further stated that sales representatives would have twenty-four hours to report back to management "on WHY the low dose was used and HOW the doctor plans to titrate the patient to effective dose." *Id.* Burlakoff continued, stating that sales representatives "must educate [their] physicians how to ensure their patients find the 'EFFECTIVE DOSE',(sic) I will go as far as to

say that **we are truly better off dissuading a physician to prescribe Subsys for 100 and 200 mcg** until we have had ample time to review how (sic) clinical trial data with them via the Rauck study. After all, you only get once (sic) chance to make a first impression, is this the lack (sic) impression we want to make for our superior product?" *Id*. (emphasis added).

112. On September 19, 2012, during the national sales meeting held in Phoenix, Arizona, where Insys's headquarters are located, Michael Babich, President and CEO of Insys, informed all of the sales representatives that "they should be telling their doctors that while they [the sales representative] had to tell the doctor to start patients at 100 mcg, they had heard from other doctors that the doctor could start a patient taking 800 mcg of Actiq on 400 mcg of Subsys."

113. Insys's "Effective Dose" message ignores Subsys's FDA-approved labeling, which requires physicians to start patients at the lowest dose, 100 mcg, and titrate upward to achieve a dose at which the patient's breakthrough cancer pain is relieved. Furthermore, the message to start at a higher dose of 400 mcg ignores the warnings listed on the Subsys label, which warns of the risk of fatal respiratory depression in patients who received improper dosing. *See* Ex. 2, Subsys Label, at 3. Without regard to the FDA-approved labeling, Insys has required sales representatives to push its "Effective Dose" message aimed at inducing doctors to start their patients on a higher dose of Subsys in an effort to improve its sales for Subsys.

## VII.   ACTIONABLE CONDUCT

### A.   Applicable Law

#### i.   The False Claims Act

114. This is an action to recover damages and civil penalties on behalf of the United States and Relator arising from the false or fraudulent statements, claims, and acts by Insys made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

115. For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

(A)     knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008)

(C)     conspires to defraud the Government by committing a violation of the FCA;

****

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal material to an obligation to pay or transmit money or property to the Government.

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.

116. The amended FCA defines "claim" as:

(A) mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

117. The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

118. Based on these provisions, Relator Furchak, on behalf of the United States Government and behalf of the United States Government and the States of States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Washington, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and Doe States 1 – 21 seek through this action to recover damages and civil penalties arising from Insys's causation of the submission of false claims to the federal and state governments. In this case, such claims were submitted to the federal and state governments for payment for Insys's drug Subsys. Relator believes that the United States and the states have suffered significant damages as a result of false claims for payment for Subsys.

119. There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator Furchak is an original source as defined therein. Relator Furchak has direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relator Furchak has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. As required pursuant to 31 U.S.C. § 3730(b) and (e), Relator Furchak has voluntarily provided information, oral and/or written, and has sent disclosure statement(s)

describing all material evidence, and information, related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the United States and the United States Attorney for the District of Southern Texas, Houston Division.  Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the United States and the United States Attorney for District Southern Texas, Houston Division.

120.  Just as Relator Furchak has voluntarily disclosed information and/or documents to the United States before and contemporaneously with this Original Complaint, as described in the preceding paragraph, Relator has made the same voluntary disclosures to the named *qui tam* states at the same time.

121.  This Original Complaint details Relator Furchak's discovery and investigation of the Defendants' fraudulent schemes and is supported by documentary evidence.

### B. Insys's Violations of the FCA

#### i. Defendants' Off-Label Marketing and Kickback Schemes Violate the FCA, 31 U.S.C. §3729(a)(1)(A).

122.  Because of the illegal acts described above, Insys has reaped illegal profits for claims of reimbursement for Subsys prescriptions submitted to Medicare, state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan, and other federal healthcare program patients.  Insys violated the FDCA by distributing its drug Subsys that was misbranded.  Insys illegally misbranded Subsys because its labeling was false or misleading, its labeling did not bear adequate directions for use, and/or its labeling did not bear adequate warnings against unsafe dosage or methods of administration or application.  Insys's conduct also violated federal laws prohibiting a manufacturer from promoting off-label uses of its drugs.

123.  Moreover, Insys violated the Anti-Kickback Statute by providing kickbacks to doctors in the form of "honoraria," consulting fees, and many other forms.  The sheer number of these schemes, their similarity, and the sparseness of the obligations imposed on physicians in exchange for the cash, point to the conclusion that these "programs" were mere incentives/rewards for prescribing Subsys.

124.  Insys knew that its false marketing, fraudulent misrepresentations and kickbacks would cause physicians and pharmacists to submit claims for fraudulent Medicaid and Medicare reimbursement.  Insys also knew that its false marketing materials, false and misleading representations and kickbacks by its sales representatives would induce doctors to write prescriptions for off-label uses or prescriptions tainted by kickbacks.

125.  Insys's fraudulent scheme to aggressively and illegally market its drugs for off-label use and integrate various forms of illegal kickbacks into its off-label sales campaigns led to increased prescriptions for its drugs.  Virtually all off-label prescriptions for these drugs for which Medicaid, state Medicare programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan, and other federal healthcare programs paid were a direct result of these illegal sales campaigns.  Thus, these Medicaid, state Medicare programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan, and other federal healthcare program claims for off-label prescriptions are tainted by the associated illegal kickbacks, as well as by Insys's "mislabeling" of its drugs.  Insys's scheme violated the Anti-Kickback Statute and the FDA's prohibitions on the promotion of off-label uses, and therefore caused false and fraudulent claims to be submitted by physicians in violation of the FCA.  By taking part in this false and fraudulent scheme, Insys repeatedly and with continued knowledge violated the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

126. Kickback-tainted claims are non-reimbursable because compliance with the Anti-Kickback statute is a condition of payment of any claims submitted for payment to federal healthcare programs, including Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan and other federal health care programs. Furthermore, claims resulting from a kickback scheme are inherently false and/or fraudulent, as the claims are the product of false and/or fraudulent conduct. Finally, the Anti-Kickback Statute specifies, as amended in 2009, that a claim for reimbursement arising from an illegal kickback is false for purposes of the False Claims Act.

127. The claims submitted for Insys's drug Subsys are false and/or fraudulent not only because they are presented with the knowledge that they are ineligible for payment, but because they are based on and/or contain false certifications or representations made or caused to be made by Insys, to Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan and other federal health care programs. Specifically, due to Insys's false and/or fraudulent schemes to induce physicians and pharmacists to prescribe Subsys for off-label indications, Insys caused physicians and pharmacists to make false/and or fraudulent express caused physicians and pharmacists to make express certifications in Medicare and state Medicaid provider enrollment forms that they would comply with all federal and state laws and regulations applicable to Medicare and Medicaid, including the Anti-Kickback Statute.

128. Insys through its false and/or fraudulent schemes to induce physicians and pharmacists to prescribe Subsys for off-label indications also caused physicians and pharmacists to make express and/or implied certifications in the various state Medicaid provider enrollment forms that they would comply with all federal and state laws applicable to

Medicaid, representative examples of which certifications are described above. Finally, Insys continues to cause physician and pharmacists to make false implied and or express certifications of compliance with all federal and state laws and regulations applicable to Medicare and Medicaid, including the Anti-Kickback Statute, and certifications that the prescriptions are medically indicated and necessary for the health of the patient, in submitting claims for reimbursement to Medicare, CHAMPUS/TRICARE, CHAMPVA, the state Medicaid programs, Federal Employees Health Benefits Plan and other government programs, as described above. Compliance with each of those certifications was and is a condition of payment for Medicare and Medicaid and the other federal health care programs.

129. Given the structure of the health care systems, and given the nature of Insys's false and/or fraudulent claims, statements, representations, and records, these false and/or fraudulent claims, statements, representations, and/or false records, had the potential to influence the government's payment decision.

130. The ultimate submission by physicians and pharmacists of false and/or fraudulent claims to Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan and/or other federal health care programs was a foreseeable factor in the Government's loss, and a consequence of the schemes. Consequently, States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Washington and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, Doe States 1 – 21, and the United States Government have suffered substantial damages.

        **ii.  Defendants' Off-Label Marketing and Kickback Schemes and Their Causation of Fraudulent Certifications to be Made to Medicare,**

**Medicaid, and other Federal Health Care Programs Violate the FCA, 31 U.S.C. § 3729(a)(1)(B).**

131. The Defendants knowingly made, used or caused to be made or used, false records or statements, or omitted facts that were material to false or fraudulent claims in violations of 31 U.S.C. § 3729(a)(1)(B), through its off-label marketing schemes for its drug Subsys and by the false certifications or representations made or caused to be made by Insys to Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan and other federal health care programs when seeking to participate in the various government programs.

132. The false records or statements included, but were not limited to, the false or misleading materials and other statements provided to physicians to induce them to prescribe high volumes of Subsys. Each prescription that was written as a result of the Defendants' illegal marketing practices and/or illegal inducements represents a false and/or fraudulent record or statement. And each claim for reimbursement for such prescriptions submitted to a federal health insurance program represents a false and/or fraudulent claim for payment.

133. Additionally, Insys through its false and/or fraudulent schemes to induce physicians and pharmacists to prescribe Subsys for off-label indications, caused physicians and pharmacist to make express certifications in Medicare and State Medicaid provider enrollment forms that it would comply with all federal and state laws and regulations applicable to Medicare and Medicaid, including the Anti-Kickback Statute. Insys, through these false and/or fraudulent schemes, also caused physicians and pharmacists to make express and/or implied certifications in the various state Medicaid provider enrollment forms that they would comply with all federal and state laws applicable to Medicaid, representative examples of which are described above. Insys continues to cause physicians and pharmacists to make false implied

and/or express certifications of compliance with all federal and state laws and regulations applicable to Medicare and Medicaid, including the Anti-Kickback Statute, and certifications that the prescriptions for Subsys are medically indicated and necessary for the health of the patient, in submitting claims for reimbursement to Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan and other federal health care programs, as described above. Compliance with each of those certifications was and is a condition of payment for Medicare and Medicaid and the other programs.

134. Given the structure of the health care systems, and given the nature of Insys's false and/or fraudulent statements, representations, and records, these false and/or fraudulent statements, representations, and/or false records, had the potential to influence the government's payment decision.

135. The ultimate submission by physicians and pharmacists of false and/or fraudulent claims to Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan, and/or other federal health care programs was a foreseeable factor in the government's loss, and a consequence of the scheme. Consequently, States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Washington and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, Doe States 1 – 21 and the United States Government have suffered substantial damages.

## VIII.   CAUSES OF ACTION

### A.  COUNT I .– FALSE CLAIMS 31 U.S.C. § 3729(a)(1)(A)

136. Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

137. Insys knowingly caused to be presented false and/or fraudulent claims (i.e., for payment or approval) to Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan, and/or other federal health care programs for reimbursement of off-label prescriptions for its drug Subsys. Insys has offered and/or paid kickbacks to physicians and engaged in schemes to increase the number prescriptions submitted by its physician customers, resulting in claims for off-label uses of Subsys. Further, Insys has knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute. As a result of its actions, Insys repeatedly and with continued knowledge has caused false and/or fraudulent claims to be presented to the federal government for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

138. The United States paid the false and/or fraudulent claims.

139. By virtue of the false and/or fraudulent claims that the Defendants presented or caused to be presented, the United States has suffered substantial monetary damages.

**B. COUNT II. – FALSE RECORDS OR STATEMENTS 31 U.S.C. § 3729(a)(1)(B)**

140. Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs in this Complaint.

141. The Defendants knowingly made, used or caused to be made or used, false records or statements, or omitted facts that were material to false or fraudulent claims in violations of 3729(a)(1)(B) through its off-label marketing schemes for its drug Subsys and for

53

causing physicians and pharmacists to submit the false certifications or representations, to Medicare, the state Medicaid programs, CHAMPUS/TRICARE, CHAMPVA, Federal Employees Health Benefits Plan, and/or other federal health care programs when seeking to participate in the various government programs. Each claim the physicians and/or pharmacists submitted for reimbursement as a result of Insys's illegal marketing practices and/or illegal inducements for such prescriptions, as well as the false certifications Insys caused to be made represents a false and/or fraudulent claim.

142. By virtue of the false records or statements that Defendants have made or used or caused to be made or used, the United States has suffered monetary damages.

## RELIEF

143. On behalf of the United States Government, the *qui tam* Relator seeks to receive monetary damages equal to three times that suffered by the United States Government. In addition, the *qui tam* Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

144. The *qui tam* Relator seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

145. The *qui tam* Relator seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

## PRAYER

146. WHEREFORE, Relator prays that this Court enter judgment on behalf of the Relator and against Defendants for the following:

a. Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;

b. Civil penalties against Defendants equal to $11,000 for each violation of 31 U.S.C. § 3729;

c. The maximum amount allowed pursuant to 31 U.S.C. §3730(d);

d. All costs and expenses of this litigation, including attorney's fees and costs of court; and

e. All other relief on behalf of Relator or the United States Government to which they may be entitled and that the Court deems just and proper.

**C. COUNT III. - CALIFORNIA FALSE CLAIMS ACT**

147. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

148. This is a *qui tam* action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq*.

149. Cal. Gov't Code § 12651(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

\*\*\*

(7) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

150. In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

151.  The Defendants knowingly violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be presented to the State of California and/or caused false claims to be made, used and presented to the State of California from 2012 to the present by violating Cal. Bus. & Prof. Code §§ 650-650.1 and Cal. Welf. & Inst. Code §14107.2 and the Federal Anti-Kickback Act, as described herein.

152.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the California Medicaid program and other state health care programs are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the California Anti-Kickback Statutes (Cal. Bus. & Prof. Code §§ 650-650.1 and Cal. Welf. & Inst. Code §14107.2).  Compliance with federal and state laws and regulations was a condition of payment.

153.  The State of California, by and through California Medicaid programs and other state health care programs, paid the false and/or fraudulent claims.

154.  Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of California's payment decision.

155.  The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of California's loss, and a consequence of the scheme.

156. As a result of the Defendants' violations of Cal. Gov't Code §12651(a), the State of California has been damaged.

157. There are no bars to recovery under Cal. Gov't Code §12652(d)(3), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of California. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of California. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

158. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF CALIFORNIA:

(1)     Three times the amount of actual damages that the State of California has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)     A civil penalty of up to $11,000 for each false claim that the Defendants presented or caused to be presented to the State of California;

    (3)     Prejudgment interest; and

    (4)     All costs incurred in bringing this action.

To Relator Furchak:

    (1)     The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

    (2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)     An award of reasonable attorneys' fees and costs; and

    (4)     Such further relief as this Court deems equitable and just.

### D.  COUNT IV. – COLORADO FALSE CLAIMS ACT

159.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

160.  This is a *qui tam* action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado False Claims Act, Col. Rev. Stat. Ann. § 25.5-4-304 *et seq.*

161.  Col. Rev. Stat. Ann. §25.5-4-305 provides liability for any person who

    1.     knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

    2.     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    3.     conspires to commit a violation of §25.5-4-305;

    4.     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Colorado, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State of Colorado.

162. The Defendants knowingly violated Col. Rev. Stat. Ann. § 25.5-4-305 and knowingly presented false claims to the State of Colorado and/or caused false claims to be made, used and presented to the State of Colorado from 2012 to the present by violating the Federal Anti-Kickback Statute, as described herein.

163. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the Colorado Medicaid program and other state health care programs are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

164. The State of Colorado, by and through the Colorado Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

165. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Colorado's payment decision.

166. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Colorado's loss, and a consequence of the scheme.

167. As a result of the Defendants' violations of Col. Rev. Stat. Ann. §25.5-4-305, the State of Colorado has been damaged.

168. There are no bars to recovery under Col. Rev. Stat. Ann. §25.5-4-306, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with

direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Col. Rev. Stat. Ann. §25.5-4-306(2) on behalf of himself and the State of Colorado. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Colorado. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Colorado. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

169. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Colorado in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages that the State of Colorado has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of up to $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Colorado;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relator Furchak:

    (1)    The maximum amount allowed pursuant to Col. Rev. Stat. Ann. §25.5-4-306 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

**E. COUNT V. – CONNECTICUT ACT IMPLEMENTING THE PROVISIONS OF THE BUDGET CONCERNING HUMAN SERVICES AND MAKING CHANGES TO VARIOUS SOCIAL SERVICES STATUTES**

170. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

171. This is a *qui tam* action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut Act Implementing the Provisions of the Budget Concerning Human Services and Making Changes to Various Social Services Statutes, Conn. Gen. Stat. 17b-301a *et seq.*

172. Conn. Gen. Stat. 17b-301b(a) provides liability for any person who

    A.    knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under medical assistance programs administered by the Department of Social Services;

    B.    knowingly makes, uses or causes to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services;

    C.    conspires to defraud the state by securing the allowance or payment of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services;

    D.    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under medical

assistance programs administered by the Department of Social Services.

173. The Defendants knowingly violated Conn. Pub. Act. No. 09-5, § 2 and knowingly presented false claims to the State of Connecticut and/or caused false claims to be made, used and presented to the State of Connecticut from 2012 to the present by violating the Federal Anti-Kickback Statute, as described herein.

174. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the medical assistance programs administered by the Connecticut Department of Social Services are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

175. The State of Connecticut, by and through the medical assistance programs administered by the Connecticut Department of Social Services, paid the false and/or fraudulent claims.

176. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Connecticut's payment decision.

177. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Connecticut's loss, and a consequence of the scheme.

178. As a result of the Defendants' violations of Conn. Gen. Stat. § 17-301b(a), the State of Connecticut has been damaged.

179. There are no bars to recovery under Conn. Gen. Stat. § 17-301i(a), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Conn. Gen. Stat. § 17-301i(a) on behalf of himself and the State of Connecticut. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Connecticut. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Connecticut. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

180. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Connecticut in the operation of the medical assistance programs administered by the Connecticut Department of Social Services.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF CONNECTICUT:

(1)     Three times the amount of actual damages that the State of Connecticut has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of up to $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Connecticut;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Conn. Pub. Act No. 09-5, § 6(b) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**F.   COUNT VI. - DELAWARE FALSE CLAIMS AND REPORTING ACT**

181.   Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

182.   This is a *qui tam* action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code.

183.   6 Del. C. § 1201(a) provides liability for any person who-

(1)     knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

(3)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; or

\*\*\*

(7)     knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

436.    In addition, 31 Del. C. § 1005 prohibits the solicitation or receipt of any remuneration (including kickbacks, bribes or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any public assistance program.

184.  The Defendants knowingly violated 6 Del. C. § 1201(a) and knowingly presented false claims to the State of Delaware and/or false claims to be made, used and presented to the State of Delaware from 2012 to the present by violating the Federal Anti-Kickback Act and the Delaware Anti-Kickback Statute (31 Del. C. § 1005), as described herein.

185.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the Delaware Medicaid program and other state health care programs are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Act and the Delaware Anti-Kickback Statute (31 Del. C. § 1005). Compliance with federal and state laws and regulations was a condition of payment.

186.  The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

187. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Delaware's payment decision.

188. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Delaware's loss, and a consequence of the scheme.

189. As a result of the Defendants' violations of 6 Del. C. § 1201(a), the State of Delaware has been damaged.

190. There are no bars to recovery under 6 Del. C. § 1206(c), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Delaware. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Delaware. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

191.  This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF DELAWARE:

(1)     Three times the amount of actual damages that the State of Delaware has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Delaware;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to 6 Del. C. § 1205, and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## G.  COUNT VII. - DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

192.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

193. This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13 *et seq.*

194. D.C. Code § 2-308.14(a) provides liability for any person who-

    (1)    knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

    (3)    conspires to defraud the District by getting a false claim allowed or paid by the District;

    \*\*\*

    (7)    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

195. The Defendants knowingly violated D.C. Code § 2-308.14(a) and knowingly presented false claims to the District of Columbia and/or caused false claims to be made, used and presented to the District of Columbia from 2012 to the present by violating the Federal Anti-Kickback Act and the District of Columbia Anti-Kickback Statute (D.C. Code § 4-802), as described herein.

196. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the District of Columbia's Medicaid program and other state health care programs are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-

Kickback Act and the District of Columbia Anti-Kickback Statute (D.C. Code § 4-802). Compliance with federal and state laws and regulations was a condition of payment.

197. The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

198. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the District of Columbia's payment decision.

199. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the District of Columbia's loss, and a consequence of the scheme.

200. As a result of the Defendants' violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged.

201. There are no bars to recovery under D.C. Code §2-308.15(c)(2), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the District of Columbia. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the District of Columbia. This

Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

202. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the DISTRICT OF COLUMBIA:

(1)    Three times the amount of actual damages that the District of Columbia has sustained as a result of the fraudulent and illegal practices of the Defendants

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the District of Columbia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)    The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## H.  COUNT VIII. - FLORIDA FALSE CLAIMS ACT

203. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

204. This is a *qui tam* action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

205. Fla. Stat. § 68.082(2) provides liability for any person who-

    1.    knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

    2.    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

    3.    conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid;

    4.    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

206. The Defendants knowingly violated Fla. Stat. § 68.082(2) and knowingly presented false claims to the State of Florida and/or caused false claims to be made, used and presented to the State of Florida from 2012 to the present by violating of the Federal Anti-Kickback Act and the Florida Anti-Kickback Statute (Fla. Stat. § 409.920), as described herein.

207. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit the Florida Medicaid program and/or other state health care programs are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Act

and the Florida Anti-Kickback Statute (Fla. Stat. § 409.920). Compliance with federal and state laws and regulations was a condition of payment.

208. The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, paid the false and/or fraudulent claims.

209. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Florida's payment decision.

210. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Florida's loss, and a consequence of the scheme.

211. As a result of the Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged.

212. There are no bars to recovery under Fla. Stat. § 68.087(3), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Florida. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Florida. This Complaint

details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

213. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF FLORIDA:

(1)     Three times the amount of actual damages that the State of Florida has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Florida;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## I.  COUNT IX. – GEORGIA FALSE MEDICAID CLAIMS ACT

214. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

215. This is a *qui tam* action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Georgia Code Ann. § 49-4-168 *et seq.*

216. Georgia Code Ann. § 49-4-168.1 provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

(4) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

217. The Defendants knowingly violated Ga. Code. Ann. § 49-4-168.1 and knowingly presented false claims to the State of Georgia and/or caused false claims to be made, used and presented to the State of Georgia from 2012 to the present by violating the Federal Anti-Kickback Act, as described herein.

218. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the Georgia Medicaid program and/or other state health care programs are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Anti-Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

219. The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

220. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Georgia's payment decision.

221. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Georgia's loss, and a consequence of the scheme.

222. As a result of the Defendants' violations of Georgia Code Ann. § 49-4-168.1, the State of Georgia has been damaged.

223. There are no bars to recovery under Georgia Code Ann. § 49-4-168.2, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Georgia Code Ann. § 49-4-168.1 on behalf of himself and the State of Georgia. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Georgia. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Georgia. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

224. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF GEORGIA:

(1)     Three times the amount of actual damages that the State of Georgia has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Georgia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Georgia Code Ann. § 49-4-168.2 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## J.   COUNT X. - HAWAII FALSE CLAIMS ACT

225. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

226. This is a *qui tam* action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

227. Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

    (1)    knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

    (3)    conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

    (4)    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

228. The Defendants knowingly violated Haw. Rev. Stat. § 661-21(a) and knowingly presented false claims to the State of Hawaii and/or caused false claims to be made, used and presented to the State of Hawaii from 2012 to the present by violating the Federal Anti-Kickback Act and the Hawaii Anti-Kickback Statute (Haw. Rev. Stat. § 346-43.5), as described herein.

229. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the Hawaii Medicaid program and/or other state health care programs are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Act

and the Hawaii Anti-Kickback Statute (Haw. Rev. Stat. § 346-43.5).  Compliance with federal

and state laws and regulations was a condition of payment

230.  The State of Hawaii, by and through the Hawaii Medicaid program and other state

health care programs, paid the false and/or fraudulent claims.

231. Given the structure of the health care systems, the false claims, statements,

representations, material omissions, and/or records made by the Defendants had the potential to

influence the State of Hawaii's payment decision.

232. The ultimate submission by the physicians or pharmacists of false and/or

fraudulent claims to the state programs was a foreseeable factor in the State of Hawaii's loss,

and a consequence of the scheme.

233.  As a result of the Defendants' violations of Haw. Rev. Stat. § 661-21(a), the State

of Hawaii has been damaged.

234.  There are no bars to recovery under Haw. Rev. Stat. § 661-28, and, or in the

alternative, Relator is an original source as defined therein.  Relator is a private person with

direct and independent knowledge of the allegations of this Complaint, who has brought this

action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

To the extent that any allegations or transactions herein have been publicly disclosed, Relator

has knowledge that is independent of and materially adds to any publicly disclosed allegations

or transactions.  Relator has voluntarily provided information, oral and/or written, and has sent

disclosure statement(s) describing all material evidence and information related to this

Complaint, both before and contemporaneously with filing, to the Attorney General of the

State of Hawaii.  Contemporaneously with filing, Relator has provided all material documents

related to this Complaint to the Attorney General of the State of Hawaii.  This Complaint

details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

235. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF HAWAII:

(1) Three times the amount of actual damages that the State of Hawaii has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Hawaii;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. §661-27 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**K. COUNT XI. - ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT**

236. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

237. This is a *qui tam* action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175 *et seq*.

238. 740 Ill. Comp. Stat. 175/3(a)(1) provides liability for any person who-

    1.    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    2.    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    3.    conspires to commit a violation of 740 Ill. Comp. Stat. 175/3(a)(1);

    4.    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

437. In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

239. The Defendants knowingly violated 740 ILCS 175/3(a) and knowingly presented false claims to State of Illinois and/or caused false claims to be made, used and presented to the State of Illinois from 2012 to the present by violating the Federal Anti-Kickback Statute and the Illinois Anti-Kickback Statute 305 ILCS 5/8A-3(b), as described herein.

240. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the Illinois Medicaid program and/or other state health care programs are false or fraudulent. Further, Insys

knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Illinois Anti-Kickback Statute 305 ILCS 5/8A-3(b). Compliance with federal and state laws and regulations was a condition of payment.

241. The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

242. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Illinois's payment decision.

243. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Illinois's loss, and a consequence of the scheme.

244. As a result of the Defendants' violations of 740 Ill. Comp. Stat. 175/3(a), the State of Illinois has been damaged.

245. There are no bars to recovery under 740 Ill. Comp. Stat. 175/4(e)(4), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 Ill. Comp. Stat. 175/3(b) on behalf of himself and the State of Illinois. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this

Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Illinois. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Illinois. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

246. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its state programs.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF ILLINOIS:

(1)     Three times the amount of actual damages that the State of Illinois has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Illinois;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to 740 Ill. Comp. Stat. 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**L. COUNT XII. – INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**

247. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

248. This is a *qui tam* action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code §5-11-5.5-1 *et seq*.

249. Ind. Code §5-11-5.5-1(b) provides liability for any person who-

    (b)    Knowingly or intentionally:

    (1)    presents a false claim to the state for payment or approval;

    (2)    makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

    (3)    with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

    (4)    with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

    (5)    receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

    (6)    makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

    (7)    conspires with another person to perform an act described in § 5-11-5.5-2; or

    (8)    causes or induces another person to perform an act described in subdivisions (1) through (6).

250. The Defendants knowingly violated Ind. Code § 5-11-5.5-2 and knowingly presented false claims to the State of Indiana and/or caused false claims to be made, used and presented to the State of Indiana from 2012 to the present by violating the Federal Anti-

Kickback Statute and the Indiana Anti-Kickback Statute (Ind. Code § 12-15-24-2), as described herein.

251.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the Indiana Medicaid program and/or other state health care programs are false or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Indiana Anti-Kickback Statute (Ind. Code § 12-15-24-2).  Compliance with federal and state laws and regulations was a condition of payment.

252. The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

253. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Indiana's payment decision.

254. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Indiana's loss, and a consequence of the scheme.

255.  As a result of the Defendants' violations of Ind. Code § 5-11-5.5-1(b), the State of Indiana has been damaged.

256. There are no bars to recovery under Ind. Code § 5-11-5.5-7(f), and, or in the alternative, Relator is an original source as defined therein.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this

84

action pursuant to Ind. Code §5-11-5.5-1(b) on behalf of himself and the State of Indiana. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Indiana. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Indiana. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

257. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF INDIANA:

    (1)    Three times the amount of actual damages that the State of Indiana has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Indiana;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Ind. Code §5-11-5.5-6(a) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## M. COUNT XIII. – IOWA FALSE CLAIMS ACT

258. Relator realleges and incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

259. This is a *qui tam* action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code Ann. § 685.1 *et seq.*

260. Iowa Code Ann. § 685.2(1) provides liability for any person who

(a)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c)     conspires to commit a violation of § 685.2(1);

(d)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

261. The Defendants knowingly violated Ind. Code § 5-11-5.5-2 and knowingly presented false claims to the State of Iowa and/or caused false claims to be made, used and presented to the State of Iowa from 2012 to the present by violating the Federal Anti-Kickback Act, as described herein.

262. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Iowa Medicaid programs

and/or other state health care programs that are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

263. The State of Iowa, by and through the Iowa Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

264. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Iowa's payment decision.

265. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Iowa's loss and a consequence of the scheme.

266. As a result of the Defendants' violations of Iowa Code Ann. § 685.2(1), the State of Iowa has been damaged.

267. There are no bars to recovery under Iowa Code Ann. § 685.3(5) and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to § 685.3(2) on behalf of himself and the State of Iowa. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both

before and contemporaneously with filing, to the Attorney General of the State of Iowa. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Iowa. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

268. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF IOWA:

    i. Three times the amount of actual damages that the State of Iowa has sustained as a result of the fraudulent and illegal practices of the Defendants;

    ii. A civil penalty of not less than $5,000 for each false claim that the Defendants presented or caused to be presented to the State of Iowa;

    iii. Prejudgment interest; and

    iv. All costs incurred in bringing this action.

To RELATOR FURCHAK:

    (1) The maximum amount allowed pursuant to Iowa Code Ann. § 685.3(4) and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

**N. COUNT XIV. - LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW**

269.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

270.  This is a *qui tam* action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann.§ 46:437.1 *et seq.*

271.  La. Rev. Stat. Ann. § 46:438.3 provides -

   (a)   No person shall knowingly present or cause to be presented a false or fraudulent claim;

   (b)   No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds; and

   (c)   No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

438.  In addition, La. Rev. Stat. Ann. § 46:438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

272.  The Defendants knowingly violated La. Rev. Stat. Ann. § 46:438.3 and knowingly presented false claims to the State of Louisiana and/or caused false claims to be made, used and presented to the State of Louisiana from 2012 to the present by violating the Federal Anti-Kickback Statute and the Louisiana Anti-Kickback Statute (La. Rev. Stat. Ann. § 46:438.2(A)), as described herein.

273.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to the Louisiana Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further,

Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Louisiana Anti-Kickback Statute (La. Rev. Stat. Ann. § 46:438.2(A)). Compliance with federal and state laws and regulations was a condition of payment.

274. The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

275. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Louisiana's payment decision.

276. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Louisiana's loss, and a consequence of the scheme.

277. As a result of Defendants' violations of La. Rev. Stat. Ann. § 46:438.3, the State of Louisiana has been damaged.

278. There are no bars to recovery under La. Rev. Stat. Ann. § 46:439.1(E), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 46:439.1(A) on behalf of himself and the State of Louisiana. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information

related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Louisiana. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Louisiana. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

279. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF LOUISIANA:

(1) Three times the amount of actual damages that the State of Louisiana has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Louisiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1) The maximum amount allowed pursuant to La. Rev. Stat. § 46:439.4(A) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## O. COUNT XV. – MARYLAND FALSE CLAIMS ACT

280. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

281. This is a *qui tam* action brought by Relator and the State of Maryland to recover treble damages and civil penalties under the Maryland False Claims Act, Md. Code Ann. Health-Gen. §2-601 *et seq.*

282. Md. Code Ann. Health-Gen. §2-602 provides liability for any person who

(a)    knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c)    conspires to commit a violation of §2-602;

(d)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Maryland, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State of Maryland.

439. The Defendants knowingly violated Md. Code Ann. §2-602 and knowingly presented false claims to the State of Maryland and/or caused false claims to be made, used and presented to the State of Maryland from 2012 to the present by violating the Federal Anti-Kickback Statute, as described herein.

283. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Maryland Medicaid programs and/or other state health care programs are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting

fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

284. The State of Maryland, by and through the Maryland Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

285. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Maryland's payment decision.

286. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Maryland's loss, and a consequence of the scheme.

287. As a result of the Defendants' violations of Md. Code Ann. Health-Gen. §2-602, the State of Maryland has been damaged.

288. There are no bars to recovery under Md. Code Ann. Health-Gen. §2-606, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Md. Code Ann. Health-Gen. §2-604(a) on behalf of himself and the State of Maryland. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Maryland. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Maryland.

This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

289. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Maryland in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MARYLAND:

(1)     Three times the amount of actual damages that the State of Maryland has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of up to $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Maryland;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Md. Code Ann. Health-Gen. §2-602 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## P. COUNT XVI. - MASSACHUSETTS FALSE CLAIMS ACT

290. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

291. This is a *qui tam* action brought by Relator and the Commonwealth of Massachusetts for treble damages and penalties under the Massachusetts False Claims Act, Mass. Gen. Laws Ann. 12 § 5(A) *et seq.*

292. Mass. Gen. Laws Ann. 12 § 5B provides liability for any person who-

    (1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

    (3)    conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

    (4)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or to transmit money or property to the commonwealth or political subdivision thereof.

293. In addition, Mass. Gen. Laws Ann. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or overtly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

294. The Defendants knowingly violated Mass. Gen. Laws Ann. 12 § 5B and knowingly presented false claims to the Commonwealth of Massachusetts and/or caused false claims to be made, used and presented to the Commonwealth of Massachusetts from 2012 to the present by violating the Federal Anti-Kickback Statute and the Massachusetts Anti-Kickback Statute (Mass. Gen. Laws Ann. 118E §41), as described herein.

295. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Massachusetts Medicaid

programs and/or other state health care programs that are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false, including but not limited to the Federal Anti-Kickback Statute and the Federal Anti-Kickback Statute and the Massachusetts Anti-Kickback Statute (Mass. Gen. Laws Ann. 118E §41). Compliance with federal and state laws and regulations was a condition of payment.

296. The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

297. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the Commonwealth of Massachusetts's payment decision.

298. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the Commonwealth of Massachusetts's loss, and a consequence of the scheme.

299. As a result of the Defendants' violations of Mass. Gen. Laws Ann. 12 § 5B, the Commonwealth of Massachusetts has been damaged.

300. There are no bars to recovery under Mass. Gen. Laws Ann. 12 § 5G, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann. 12 § 5C(2) on behalf of himself and the Commonwealth of Massachusetts. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds

to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the Commonwealth of Massachusetts. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the Commonwealth of Massachusetts. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

301. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the COMMONWEALTH OF MASSACHUSETTS:

(1)   Three times the amount of actual damages that the Commonwealth of Massachusetts has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the Commonwealth of Massachusetts;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)   The maximum amount allowed pursuant to Mass. Gen. Laws Ann.12, §5F and/or any other applicable provision of law;

      (2)     Reimbursement for reasonable expenses that Relators incurred in connection with this action;

      (3)     An award of reasonable attorneys' fees and costs; and

      (4)     Such further relief as this Court deems equitable and just.

**Q. COUNT XVII. - MICHIGAN FALSE CLAIMS ACT**

302. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

303. This is a *qui tam* action brought by Relator and the State of Michigan for treble damages and penalties under the Michigan False Claims Act, Mich. Comp. L. § 400.601 *et seq.*

304. Mich. Comp. L. §§ 400.603, 400.606 and 400.607 provides liability for any person who-

      (1)     knowingly makes or causes to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit;

      (2)     makes or presents or causes to be made or presented to an employee or officer of this state a claim under Medicaid, knowing the claim to be false;

      (3)     enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false under §§ 400.1 to 400.121.

305. The Defendants knowingly violated Mich. Comp. Laws §§ 400.603 to 400.607 and knowingly presented false claims to the State of Michigan and/or caused false claims to be made, used and presented to the State of Michigan from 2012 to the present by violating the Federal Anti-Kickback Statute and the Michigan Anti-Kickback Statute (Mich. Comp. Laws § 400.604), as described herein.

306. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Michigan Medicaid

programs and/or other state health care programs that are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Michigan Anti-Kickback Statute (Mich. Comp. Laws § 400.604). Compliance with federal and state laws and regulations was a condition of payment.

307. The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

308. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Michigan's payment decision.

309. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Michigan's loss, and a consequence of the scheme.

310. As a result of the Defendants' violations of Mich. Comp. L. §§ 400.603, 400.606 and 400.607, the State of Michigan has been damaged.

311. There are no bars to recovery under Mich. Comp. L. § 400.610a(13), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mich. Comp. L. § 400.610a(9) on behalf of himself and the State of Michigan. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or

written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Michigan. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Michigan. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

312. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MICHIGAN:

(1)     Three times the amount of actual damages that the State of Michigan has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Michigan;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Mich. Comp. L. §400.610a(9) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**R. COUNT XVIII. – MINNESOTA FALSE CLAIMS ACT**

313.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

314.  This is a *qui tam* action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. Ann. § 15C.01 *et seq.*

315.  Minn. Stat. Ann. § 15C.02 provides liability for any person who

(a)     knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c)     conspires either to present a false or fraudulent claim to the state for payment or approval or to make, use, or cause to made or used a false record or statement to obtain payments or approval of a false or fraudulent claim;

(d)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Minnesota, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State of Minnesota.

440.   The Defendants knowingly violated Minn. Stat. Ann. §15C.02 and knowingly presented false claims to the State of Minnesota and/or caused false claims to be made, used and presented to the State of Minnesota from 2012 to the present by violating the Federal Anti-Kickback Statute, as described herein.

316.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Minnesota Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further,

Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

317. The State of Minnesota, by and through the Minnesota Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

318. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Minnesota's payment decision.

319. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Minnesota's loss, and a consequence of the scheme.

320. As a result of the Defendants' violations of Minn. Stat. Ann. § 15C.02, the State of Minnesota has been damaged.

321. There are no bars to recovery under Minn. Stat. Ann. § 15C.05 and Minn. Stat. Ann. §15C.01, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Minn. Stat. Ann. § 15C.01 on behalf of himself and the State of Minnesota. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material

evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Minnesota. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Minnesota. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

322. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Minnesota in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MINNESOTA:

(1) Three times the amount of actual damages that the State of Minnesota has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Minnesota;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1) The maximum amount allowed pursuant to Minn. Stat. Ann. § 15C.13 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**S. COUNT XIX. - MONTANA FALSE CLAIMS ACT**

323.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

324.  This is a *qui tam* action brought by Relator and the State of Montana for treble damages and penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

325.  Mont. Code Ann. § 17-8-403(1) provides liability for any person who-

(1)  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)  knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

(3)  conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(4)  knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

326.  The Defendants knowingly violated Mont. Code Ann. § 17-8-403 and knowingly presented false claims to the State of Montana and/or caused false claims to be made, used and presented to the State of Montana from 2012 to the present by violating the Federal Anti-Kickback Statute and the Montana Anti-Kickback Statute (Mont. Code Ann § 45-6-313), as described herein.

327.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Montana Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further,

Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Montana Anti-Kickback Statute (Mont. Code Ann § 45-6-313). Compliance with federal and state laws and regulations was a condition of payment.

328.  The State of Montana, by and through the Montana Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

329.  Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Montana's payment decision.

330.  The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Montana's loss, and a consequence of the scheme.

331.  As a result of the Defendants' violations of Mont. Code Ann. § 17-8-403(1), the State of Montana has been damaged.

332.  There are no bars to recovery under Mont. Code Ann. § 17-8-403(5)(c), and, or in the alternative, Relator is an original source as defined therein.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mont. Code Ann. § 17-8-410 on behalf of himself and the State of Montana. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.  Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this

Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Montana. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Montana. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

333. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MONTANA:

(1) Three times the amount of actual damages that the State of Montana has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Montana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1) The maximum amount allowed pursuant to Mont. Code Ann. § 17-8-410 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**T.  COUNT XX. - NEVADA FALSE CLAIMS ACT**

334.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

335.  This is a *qui tam* action brought by Relator and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010, *et seq.*

336.  N.R.S. § 357.040(1) provides liability for any person who-

> (1)  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2)  knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the state or any political subdivision thereof;
>
> (3)  conspires to defraud the state or any political subdivision thereof through the allowance or payment of a fraudulent claim;
>
> (4)  knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

337.  In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

338.  The Defendants knowingly violated N.R.S. § 357.040(1) and knowingly presented false claims to the State of Nevada and/or caused false claims to be made, used and presented to the State of Nevada from 2012 to the present by violating the Federal Anti-Kickback Statute and the Nevada Anti-Kickback Statute (N.R.S. § 422.560), as described herein.

339.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Nevada Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Nevada Anti-Kickback Statute (N.R.S. § 422.560).  Compliance with federal and state laws and regulations was a condition of payment.

340. The State of Nevada, by and through the Nevada Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

341. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Nevada's payment decision.

342. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Nevada's loss, and a consequence of the scheme.

343. As a result of the Defendants' violations of N.R.S. § 357.040(1), the State of Nevada has been damaged.

344. There are no bars to recovery under N.R.S. § 357.100, and, or in the alternative, Relator is an original source as defined therein.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on his own behalf and on behalf of the State of Nevada.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator has

knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Nevada. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Nevada. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

345. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEVADA:

(1)     Three times the amount of actual damages that the State of Nevada has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Nevada;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

**U. COUNT XXI. – NEW HAMPSHIRE MEDICAID FRAUD AND FALSE CLAIMS ACT**

346. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

347. This is a *qui tam* action brought by Relator and the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Act, N.H. Rev. Stat. Ann. § 167:61 *et. seq*.

348. N.H. Rev. Stat. Ann. §167:61-b(I) provides liability for any person who-

    (1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the state or any political subdivision thereof;

    (3)    conspires to defraud the state or any political subdivision thereof through the allowance or payment of a fraudulent claim;

    (4)    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

349. The Defendants knowingly violated N.H. Rev. Stat. Ann. § 167:61-b(I) and knowingly presented false claims to the State of New Hampshire and/or caused false claims to be made, used and presented to the State of New Hampshire from 2012 to the present by violating the Federal Anti-Kickback Act, as described herein.

350. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to New Hampshire Medicaid programs and/or other state health care programs that are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false, including but not limited to the Federal Anti-Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

351. The State of New Hampshire, by and through the New Hampshire Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

352. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of New Hampshire's payment decision.

353. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of New Hampshire's loss, and a consequence of the scheme.

354. As a result of the Defendants' violations of N.H. Rev. Stat. Ann. §167:61(I), the State of New Hampshire has been damaged.

355. There are no bars to recovery under N.H. Rev. Stat. Ann. § 167:61-e(III)(d), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.H. Rev. Stat. Ann. §167:61-e on behalf of himself and the State of New Hampshire. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly

disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of New Hampshire. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of New Hampshire. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

356. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW HAMPSHIRE:

(1) Three times the amount of actual damages that the State of New Hampshire has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of New Hampshire;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1) The maximum amount allowed pursuant to N.H. Rev. Stat. Ann. §167:61-e and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## V.  COUNT XXII. - NEW JERSEY FALSE CLAIMS ACT

357.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

358.  This is a qui tam action brought by Relator and the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32-C1–2A:32-C18.

359.  N.J. Stat. Ann. § 2A:32C-3 provides liability for any person who-

(a)     knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c)     conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

360.  The Defendants knowingly violated N.J. Stat. Ann. § 2A:32C-3 and knowingly presented false claims to the State of New Jersey and/or caused false claims to be made, used and presented to the State of New Jersey from 2012 to the present by violating the Federal Anti-Kickback Statute, as described herein.

361.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to New Jersey Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or

impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

362. The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

363. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of New Jersey's payment decision.

364. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of New Jersey's loss, and a consequence of the scheme.

365. As a result of the Defendants' violations of N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey has been damaged.

366. There are no bars to recovery under N.J. Stat. Ann. § 2A:32C-9(c), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.J. Stat. Ann. § 2A:32C-5(b) on behalf of himself and the State of New Jersey. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the

State of New Jersey. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of New Jersey. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

367. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW JERSEY:

(1)  Three times the amount of actual damages that the State of New Jersey has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)  A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of New Jersey;

(3)  Prejudgment interest; and

(4)  All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)  The maximum amount allowed pursuant to N.J. Stat. Ann. § 2A:32C-37 and/or any other applicable provision of law;

(2)  Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)  An award of reasonable attorneys' fees and costs; and

(4)  Such further relief as this Court deems equitable and just.

## W. COUNT XXIII. - NEW MEXICO MEDICAID FALSE CLAIMS ACT

368. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

369. This is a *qui tam* action brought by Relator and State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*. and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq*.

370. N.M. Stat. Ann. § 27-14-4 provides liability for any person who-

    (1)    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

    (2)    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

    (3)    makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

    (4)    conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent;

    (5)    knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

371. N.M. Stat. Ann. § 44-9-3 provides liability for any person who-

    (a)    knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

    (c)    conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

    (d) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

372. The Defendants knowingly violated N.M. Stat. Ann. § 27-14-4 and § 44-9-3 and knowingly presented or caused to be made, used and presented hundreds of thousands of false claims to the State of New Mexico from 2012 to the present by violating the Federal Anti-Kickback Statute and the New Mexico Anti-Kickback Statute (N.M. Stat Ann. § 30-44-7), as described herein.

373. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to New Mexico Medicaid programs and/or other state health care programs that are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the New Mexico Anti-Kickback Statute (N.M. Stat Ann. § 30-44-7). Compliance with federal and state laws and regulations was a condition of payment.

374. The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

375. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of New Mexico's payment decision.

376.	The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of New Mexico's loss, and a consequence of the scheme.

377.	As a result of the Defendants' violations of N.M. Stat. Ann. § 27-14-4 and/or N.M. Stat. Ann. § 44-9-3 the State of New Mexico has been damaged.

378.	There are no bars to recovery under N.M. Stat. Ann. § 27-14-10(C), N.M. Stat. Ann. § 44-9-9, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M. Stat. Ann. § 27-14-7 and N.M. Stat. Ann. § 44-9-3 on behalf of himself and the State of New Mexico.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of New Mexico.  Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of New Mexico.  This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

379.	This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW MEXICO:

(1)     Three times the amount of actual damages that the State of New Mexico has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of New Mexico;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to N.M. Stat. Ann. § 27-14-4, N.M. Stat. Ann. § 44-9-7 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## X.   COUNT XXIV. - NEW YORK FALSE CLAIMS ACT

380.   Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

381.   This is a *qui tam* action brought by Relator and State of New York to recover treble damages and civil penalties under the New York False Claims Act, Bill S02108, § 187 *et seq*.

382.   N.Y. State Fin. Law § 189(1) provides liability for any person who-

(1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (2)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (3)     conspires to commit a violation of § 189(1);
>
> (4)     knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money property to the state or a local government.

441.    The Defendants knowingly violated N.Y. State Fin. Law § 189 and knowingly presented or caused to be made, used and presented hundreds of thousands of false claims to the State of New York from 2012 to the present, by violating the Federal Anti-Kickback Act, as described herein.

383.    As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to New York Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute.  Compliance with federal and state laws and regulations was a condition of payment.

384.    The State of New York, by and through the State of New York Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

385.    Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of New York's payment decision.

386. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of New York's loss, and a consequence of the scheme.

387. As a result of the Defendants' violations of N.Y. State Fin. Law § 189, the State of New York has been damaged.

388. There are no bars to recovery under N.Y. State Fin. Law. § 190(9), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.Y. State Fin. Law § 190(2) on behalf of himself and the State of New York. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of New York. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of New York. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

389. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW YORK:

(1)     Three times the amount of actual damages that the State of New York has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $6,000 and not more than $12,000 for each false claim that the Defendants presented or caused to be presented to the State of New York;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to N.Y. State. Fin. Law § 190(6) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## Y.   COUNT XXV. – NORTH CAROLINA FALSE CLAIMS ACT

390.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

391.  This is a *qui tam* action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*

392.  N.C. Gen. Stat. § 1-607 provides liability for any person who

(a)     knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c)     conspires to commit a violation of § 1-607;

(d)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of North Carolina, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State of North Carolina.

442.   The Defendants knowingly violated N.C. Gen. Stat. §1-607 and knowingly presented false claims to the State of North Carolina and/or caused false claims to be made, used and presented to the State of North Carolina from 2012 to the present by violating the Federal Anti-Kickback Statute, as described herein.

393.   As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to North Carolina Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute.  Compliance with federal and state laws and regulations was a condition of payment.

394.   The State of North Carolina, by and through the North Carolina Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

395.   Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of North Carolina's payment decision.

396.   The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of North Carolina's loss, and a consequence of the scheme.

397. As a result of the Defendants' violations of N.C. Gen. Stat. § 1-607, the State of North Carolina has been damaged.

398. There are no bars to recovery under N.C. Gen. Stat. § 1-611, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.C. Gen. Stat. § 1-608(b) on behalf of himself and the State of North Carolina. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of North Carolina. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of North Carolina. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

399. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of North Carolina in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NORTH CAROLINA:

    (1)    Three times the amount of actual damages that the State of North Carolina has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of North Carolina;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relator Furchak:

(1)     The maximum amount allowed pursuant to N.C. Gen. Stat. § 1-610 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## Z.   COUNT XXVI. – OKLAHOMA MEDICAID FALSE CLAIMS ACT

400.   Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

401.   This is a *qui tam* action brought by Relator and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. Ann. § 5053.1 *et seq.*

402.   63 Okla. Sta. Ann. § 5053.1(B) provides liability for any person who-

(a)     knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claims for payment or approval;

(b)     knowingly makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim paid or approved by the state;

(c)     conspires to defraud the State by getting a claim allowed or paid;

(d)     knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state.

403. The defendants knowingly violated 63 Okla. Stat. Ann. § 5053.1(B) and knowingly presented false claims to the State of Oklahoma and/or caused false claims to be made, used and presented to the State of Oklahoma from 2012 to the present by violating the Federal Anti-Kickback Statute and the Oklahoma Anti-Kickback Statute (56 Okla. Stat. Ann. § 1005), as described herein.

404. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Oklahoma Medicaid programs and/or other state health care programs that are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Oklahoma Anti-Kickback Statute (56 Okla. Stat. Ann. § 1005). Compliance with federal and state laws and regulations was a condition of payment.

405. The State of Oklahoma, by and through the Oklahoma Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

406. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Oklahoma's payment decision.

407. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Oklahoma's loss, and a consequence of the scheme.

408. As a result of the Defendants' violations of 63 Okla. Stat. Ann. § 5053.1(B), the State of Oklahoma has been damaged.

409. There are no bars to recovery under 63 Okla. Stat. Ann. § 5053.5, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 63 Okla. Stat. Ann. § 5053.2 on behalf of himself and the State of Oklahoma. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Oklahoma. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Oklahoma. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

410. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF OKLAHOMA:

(1)    Three times the amount of actual damages that the State of Oklahoma has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Oklahoma;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR FURCHAK:

    (1)    The maximum amount allowed pursuant to 63 Okla. Stat. Ann. § 5053.4, and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## AA.    COUNT XXVII. - RHODE ISLAND STATE FALSE CLAIMS ACT

411. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

412. This is a *qui tam* action brought by Relator and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

413. R.I. Gen. Laws § 9-1.1-3 provides liability for any person who-

    (a)    knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the guard a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

    (c)    conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

    (d)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

443. The Defendants knowingly violated R.I. Gen. Laws § 9-1.1-3 and knowingly

presented false claims to the State of Rhode Island and/or caused false claims to be made, used and presented to the State of Rhode Island from 2012 to the present by violating the Federal Anti-Kickback Statute and the Rhode Island Anti-Kickback Statutes (R.I. Gen Laws 5-48.1-3 and 40-8.2-3), as described herein.

414. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Rhode Island Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Rhode Island Anti-Kickback Statutes (R.I. Gen Laws 5-48.1-3 and 40-8.2-3).  Compliance with federal and state laws and regulations was a condition of payment.

415. The State of Rhode Island, by and through the Rhode Island Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

416. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Rhode Island's payment decision.

417. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Rhode Island's loss, and a consequence of the scheme.

418. As a result of the Defendants' violations of R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island has been damaged.

419.  There are no bars to recovery under R.I. Gen. Laws § 9-1.1-4(e)(3), and, or in the alternative, Relator is an original source as defined therein.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to R.I. § 9-1.1-4(b) on behalf of himself and the State of Rhode Island.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.  Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Rhode Island.  Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Rhode Island.  This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

420.  This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF RHODE ISLAND:

(1)     Three times the amount of actual damages that the State of Rhode Island has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Rhode Island;

 (3) Prejudgment interest; and

 (4) All costs incurred in bringing this action.

To Relator Furchak:

 (1) The maximum amount allowed pursuant to R.I. Gen. Laws § 9-1.1-4(d) and/or any other applicable provision of law;

 (2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

 (3) An award of reasonable attorneys' fees and costs; and

 (4) Such further relief as this Court deems equitable and just.

**BB. COUNT XXVIII. - TENNESSEE MEDICAID FALSE CLAIMS ACT**

421. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

422. This is a *qui tam* action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

423. § 71-5-182(a)(1) provides liability for any person who-

 (a) presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

 (b) makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

 (c) conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent;

 (d) makes, uses, or causes to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money

> or property to the state, relative to the Medicaid program, knowing such record or statement is false.

424. The Defendants knowingly violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly presented false claims to the State of Tennessee and/or caused false claims to be made, used and presented to the State of Tennessee from 2012 to the present by violating the Federal Anti-Kickback Act and the Tennessee Anti-Kickback Statute (Tenn. Code Ann. § 71-5-182), as described herein.

425. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Tennessee Medicaid programs and/or other state health care programs that are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Act and the Tennessee Anti-Kickback Statute (Tenn. Code Ann. § 71-5-182). Compliance with federal and state laws and regulations was a condition of payment.

426. The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

427. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Tennessee's payment decision.

428. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Tennessee's loss, and a consequence of the scheme.

429.  As a result of the Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged.

430.  There are no bars to recovery under Tenn. Code Ann. § 71-5-183(e)(2), and, or in the alternative, Relator is an original source as defined therein.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.  Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Tennessee.  Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Tennessee.  This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

431.  This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF TENNESSEE:

(1)     Three times the amount of actual damages that the State of Tennessee has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $25,000 for each false claim that the Defendants presented or caused to be presented to the State of Tennessee;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## CC.     COUNT XXIX. - TEXAS FALSE CLAIMS ACT

432. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

433. This is a *qui tam* action brought by Relator and the State of Texas to recover double damages and civil penalties under Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

434. Tex. Hum. Res. Code Ann. § 36.002 provides liability for any person who-

(a.)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid Program that is not authorized or that is greater than the benefit or payment that is authorized;

(b)     knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning . . . information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(c)     knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an

unauthorized payment or benefit from the Medicaid program or a fiscal agent;

(d)     knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program; or

(e)     knowingly engages in conduct that constitutes a violation under Tex Hum. Res. Code Ann. § 32.039 (the Texas Anti-Kickback Statute).

435.  The Defendants knowingly violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly presented false claims to the State of Texas and/or caused false claims to be made, used and presented to the State of Texas from 2012 to the present by violating the Federal Anti-Kickback Statute and the Texas Anti-Kickback Statute, as described herein.

436.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Texas Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Texas Anti-Kickback Statute.  Compliance with federal and state laws and regulations was a condition of payment.

437.  The State of Texas, by and through the Texas Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

438.  Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Texas's payment decision.

439. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Texas's loss, and a consequence of the scheme.

440. As a result of the Defendants' violations of Tex. Hum. Res. Code Ann. § 36.002, the State of Texas has been damaged.

441. There are no bars to recovery under Tex. Hum. Res. Code Ann. § 36.113(b), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tex. Hum. Res. Code Ann. § 36.101 on behalf of himself and the State of Texas. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Texas. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Texas. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

442. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF TEXAS:

(1)     Two times the amount of actual damages that the State of Texas has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of note less than $5,000 as described in Tex. Hum. Res. Code Ann. § 36.052(a)(3) for each false claim that the Defendants presented or caused to be presented to the State of Texas;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Tex. Hum. Res. Code Ann. § 36.110, and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**DD.     COUNT XXX. - VIRGINIA FRAUD AGAINST TAXPAYER ACT**

443.  Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

444.  This is a *qui tam* action brought by Relator and Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayer Act, Va. Code § 8.01-216.1 *et seq.*

445.  Va. Code § 8.01-216.3 provides liability for any person who-

(a)     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c)     Conspires to commit a violation of § 8.01-216.3;

(d)     Has possession, custody, or control of property or money used, or to be used, by the Commonwealth and knowingly delivers, or causes to be delivered, less than all such money or property;

(e)     Is authorized to make or deliver a document certifying receipt of property used, or to be used by the Commonwealth, and intending to defraud the Commonwealth, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(f)     Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property; or

(g)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth.

446.  The Defendants knowingly violated Va. Code Ann. § 8.01-216.3 and knowingly presented false claims of the Commonwealth of Virginia and/or caused false claims to be made, used and presented to the Commonwealth of Virginia from 2012 to the present by violating the Federal Anti-Kickback Statute and the Virginia Anti-Kickback Statute (Va. Code Ann. § 32.1-315), as described herein.

447.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Virginia Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Virginia Anti-Kickback Statute (Va. Code Ann. § 32.1-315). Compliance with federal and state laws and regulations was a condition of payment.

448. The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

449. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the Commonwealth of Virginia's payment decision.

450. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the Commonwealth of Virginia's loss, and a consequence of the scheme.

451. As a result of the Defendants' violations of Va. Code § 8.01-216.3, the Commonwealth of Virginia has been damaged.

452. There are no bars to recovery under Va. Code § 8.01-216.8, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Va. Code § 8.01-216.5 on behalf of himself and the Commonwealth of Virginia. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Virginia. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Virginia. This Complaint details Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

453. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the COMMONWEALTH OF VIRGINIA:

454.

(1)     Three times the amount of actual damages that the State of Virginia has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Virginia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Va. Code § 8.01-216.7 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just

## EE.  COUNT XXXI. - WASHINGTON FALSE CLAIMS ACT

455. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

456. This is a *qui tam* action brought by Relator and the State of Washington to recover treble damages and civil penalties under the Washington False Claims Act, Wash. Rev. Code Ann. § 74.66.020 *et seq.*

457. Wash. Rev. Code Ann. § 74.66.020(1) provides liability for any person who-

(1)     knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)     conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

(4)     knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

458. The Defendants knowingly violated Wash. Rev. Code Ann. § 74.66.020(1) and knowingly presented false claims to the State of Washington and/or caused false claims to be made, used or presented to the State of Washington from 2012 to the present by violating the H. B. No. 1738, 62nd Leg., Reg. Sess. (Wash. 2011) and the Federal Anti-Kickback Statute, as described herein.

459. As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Washington Medicaid programs and/or other state health care programs that are false and/or fraudulent. Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-

Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

460. The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

461. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Washington's payment decision.

462. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Washington's loss, and a consequence of the scheme.

463. As a result of the Defendants' violations of Wash. Rev. Code Ann. § 74.66.020(1), the State of Washington has been damaged.

464. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Wash. Rev. Code Ann. § 74.66.020 on behalf of himself and the State of Washington. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Washington. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Washington. This Complaint details

Relator's discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

465. This Court is requested to accept pendent jurisdiction of this related state claim, as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF WASHINGTON:

(1)     Three times the amount of actual damages that the State of Washington has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Washington;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Wash. Rev. Code Ann. § 74.66.070 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## FF.  Count XXXII.        WISCONSIN FALSE CLAIMS ACT

466. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

467.  This is a *qui tam* action brought by Relator and the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims Act, Wis. Stat. Ann. § 20.931 *et seq.*

468.  Wis. Stat. Ann. § 20.931(2) provides liability for any person who-

(1)  knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(5)  conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

(6)  knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors.

469.  The Defendants knowingly violated Wis. Stat. Ann. § 20.931(2) and knowingly presented false claims to the State of Wisconsin and/or caused false claims to be made, used or presented to the State of Wisconsin from 2012 to the present by violating the Federal Anti-Kickback Statute, as described herein.

470.  As a result of Insys's off-label marketing and kickback schemes, all of the claims that Insys knowingly caused physicians and pharmacists to submit to Wisconsin Medicaid programs and/or other state health care programs that are false and/or fraudulent.  Further, Insys knowingly caused physicians and pharmacists to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-

Kickback Statute. Compliance with federal and state laws and regulations was a condition of payment.

471. The State of Wisconsin, by and through the State of Wisconsin Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

472. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Wisconsin's payment decision.

473. The ultimate submission by the physicians and pharmacists of false and/or fraudulent claims to the state programs was a foreseeable factor in the State of Wisconsin's loss, and a consequence of the scheme.

474. As a result of the Defendants' violations of Wis. Stat. Ann. § 20.931(2), the State of Wisconsin has been damaged.

475. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Wis. Stat. Ann. § 20.931 on behalf of himself and the State of Wisconsin. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Wisconsin. Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the State of Wisconsin. This Complaint details Relator's

discovery and investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

476. This Court is requested to accept pendent jurisdiction of this related state claim, as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF WISCONSIN:

(1)     Three times the amount of actual damages that the State of Wisconsin has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Wisconsin;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR FURCHAK:

(1)     The maximum amount allowed pursuant to Wis. Stat. Ann. § 20.931(11) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**GG.     COUNT XXXIII. – COMMON FUND RELIEF**

477. Relator repeats and realleges each allegation contained in all paragraphs of this Complaint.

478. While the states possessing *qui tam* statutes have a regulatory scheme for rewarding the Relator for coming forward, those that have none will potentially receive a windfall with little or no investigation or commitment of time or resources to the recovery. The common-fund doctrine preserves the right of the litigant or counsel to an award from the common fund generated. The United States Supreme Court and many other courts have addressed this remedy. *Boeing Company v. Van Gemert*, 444 U.S. 472 478 (1980):

> Since the decisions in *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882), and *Central Railroad & Banking Co. v. Pettuss*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885), this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. [citations omitted]. The common-fund doctrine reflects the traditional practice in courts of equity, *Trustees v. Greenough*, supra 105 U.S., at 532-537, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees [citations omitted]. The doctrine rests upon the perception that persons who obtain the benefit of the lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense [citation omitted]. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionally among those benefitted by this suit. [citations omitted].

Accord, *In re Smithkline Beckman Corp. Securities Litig.*, 751 F. Supp. 525, 531 (E.D. Pa. 1990). A string of cases recognizes the common fund doctrine for situations such as those that may arise in this case. See "The Common Fund Doctrine: Coming of Age in the Law of Insurance Subrogation," 31 Ind. L. Rev. 313, 337–38 (1998). Relator respectfully requests this Court to award him a percentage share from the common fund generated by his actions.

## IX.    DEMAND FOR JURY TRIAL

479. Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Respectfully submitted,

*/s/ Joel M. Androphy*
Joel M. Androphy
State Bar No. 01254700
S.D. Tex. 53457
Sarah M. Frazier
State Bar No. 24027320
S.D. Tex. 27980
Noelle C. Letteri
State Bar No. 24013033
S.D. Tex. 990966
Rachel L. Grier
State Bar No. 24055592
S.D. Tex. 753341
Berg & Androphy
3740 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785
Email: jandrophy@bafirm.com
Email: sfrazier@bafirm.com
Email: nletteri@bafirm.com
Email: rgreir@bafirm.com

**Attorneys in Charge for**
**Relator Ray Furchak**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was forwarded via the United States Mail, certified, return receipt requested, by facsimile, or by messenger to the United States Attorney's Office in Houston, Texas, the Department of Justice in Washington, D.C., and the Attorneys General of the Qui Tam States and the District of Columbia on September 28, 2012.

*/s/ Rachel L. Grier*
Rachel L. Grier

## EXHIBITS TO ORIGINAL COMPLAINT

| Exhibit No. | Description of Document | Date of Document | Bates Number |
|---|---|---|---|
| No. 1 | Department of Health and Human Services: FDA's NDA Approval Letter to Insys Therapeutics, Inc. for Subsys | January. 4, 2012 | Reference Id No.: 3066874 |
| No. 2 | Subsys's Prescribing Information: Indication and Usage Document | | Reference Id. No.: 3066874 |
| No. 3 | Text message between Relator Furchak and Alec Burlakoff | August 16, 2012 | BA ITI000001 – BA ITI000009 |
| No. 4 | Text message from Alec Burlakoff to Southeast Region sales representatives | August 30, 2012 | BA ITI000010 – BA ITI 000013 |
| No. 5 | Email from Michael Babich and Matthew Napoletano to Insys's sales representatives – Page 4. | September 13, 2012 | BA ITI000014 – BAITI000019 |
| No. 6 | Email from Alec Burlakoff to all Insys's Southeast sale representatives and XunYu, with cc to Michael Babich, Matthew Napoletano, and J. Kapoor | September 17, 2012 | BA ITI000020 – BAITI000025 |